1   **SHAWN THOMAS MEERKAMPER** (CA Bar No. 296964)
    Transgender Law Center
2   P.O. Box 70976
    Oakland, CA, 94612
3   Phone: (510) 587-9696, ext. 303
    Fax: (510) 587-9699
4   shawn@transgenderlawcenter.org

5   **R. ANDREW FREE*** (TN Bar No. 30513)
    Law Office of R. Andrew Free
6   P.O. Box 90568
    Nashville, TN 37209
7   Phone: (844) 321-3221
    Fax: (615) 829-8959
8   Andrew@ImmigrantCivilRights.com
    *Admitted Pro Hac Vice*
9
    **KIMBERLY A. EVANS** (DE Bar No. 5888)
10  Grant & Eisenhofer P.A.
    123 Justison Street
11  Wilmington, DE 19801
    Phone: (302) 622-7086
12  Fax: (302) 622-7100
    kevans@gelaw.com
13  *Pro Hac Vice Admission Forthcoming*

14              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
15

16  TRANSGENDER LAW CENTER, and          )
    JOLENE K. YOUNGERS, as personal      )
17  administrator for the wrongful death estate )
    of Roxsana Hernandez,                )
18                                       )
                                         )
19      *Plaintiffs,*                    )       Civil Action No.: 3:19-cv-03032-SK
                                         )
20  v.                                   )
                                         )       **PLAINTIFFS' NOTICE OF**
21  UNITED STATES IMMIGRATION AND        )       **MOTION AND CROSS-MOTION**
    CUSTOMS ENFORCEMENT; UNITED          )       **FOR SUMMARY JUDGMENT**
22  STATES DEPARTMENT OF                 )       **AND OPPOSITION TO**
    HOMELAND SECURITY;  OFFICE FOR       )       **DEFENDANTS' MOTION FOR**
23  CIVIL RIGHTS AND CIVIL LIBERTIES –   )       **SUMMARY JUDGMENT**
    UNITED STATES DEPARTMENT OF          )
24  HOMELAND SECURITY,                   )
                                         )
25      *Defendants.*                    )
                                         )
26

27

28

---

Civil Action No.: 3:19-cv-03032-SK                    Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
                                                      and Opposition to Defendants' Motion for Summary Judgment

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

NOTICE OF MOTION .................................................................................................. 1

RELIEF SOUGHT ......................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

I. INTRODUCTION ............................................................................................. 1

II. STATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND ......................... 1

III. THE PURPOSE AND INTENT OF THE FOIA ................................................ 5

IV. LEGAL STANDARD ....................................................................................... 6

V. ARGUMENT ................................................................................................... 6

    A. DEFENDANTS FAILED TO MAKE RESPONSIVE DOCUMENTS PROMPTLY AVAILABLE AND PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT THAT DEFENDANTS' FAILED TO COMPLY WITH FOIA DEADLINES ................................... 6

    B. DEFENDANTS UNLAWFULLY DENIED PLAINTIFFS' EXPEDITED PROCESSING REQUESTS ............................................................................................................. 8

    C. DEFENDANTS FAILED TO CONDUCT AN ADEQUATE SEARCH .................................. 9

    D. DEFENDANTS IMPROPERLY WITHHELD AGENCY RECORDS WITHOUT PROPER EXEMPTION SHOWINGS ........................................................................................ 12

        1. Defendants' Vaughn Index Lacks Such Specificity That They Fail to Allow Determination of whether Exemptions are Properly Invoked ....... 14

        2. Defendants Failed to Reasonably Segregate Non-Exempt Information ... 15

        3. Defendants Failed to Adequately Justify Non-Responsive Designations. 16

        4. Defendants' Wholesale Redaction of Names Under Exemptions 6 and 7(C) is Unlawful .............................................................................. 17

        5. Defendants Unlawfully Invoked Exemption 5 to Shield Key Documents Related to Roxsana's Death .................................................... 18

        6. Defendants' Serial Misapplication of Exemption 7(E) Entitles Plaintiffs to Summary Judgment .............................................................. 20

VI. CONCLUSION .............................................................................................. 22

i

Civil Action No.: 3:19-cv-03032-SK          Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
and Opposition to Defendants' Motion for Summary Judgment

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Civil Liberties Union of Northern California v. U.S. Department of
Justice,*
   880 F.3d 473 (9th Cir. 2018) ................................................................................21

*Anguiano v. United States Immigration & Customs Enforcement,*
   356 F. Supp. 3d 917 (N.D. Cal. 2018) .................................................................21

*Assembly of California v. U.S. Department of Commerce,*
   968 F.2d 916 (9th Cir.1992) .................................................................................12

*Becker v. Internal Revenue Service,*
   34 F.3d 398 (7th Cir. 1994) ...................................................................................6

*Biodiversity Legal Foundation v. Badgley,*
   309 F.3d 1166 (9th Cir. 2002) ...............................................................................8

*Cameranesi v. U.S. Department of Defense,*
   856 F.3d 626 (9th Cir. 2017) ...............................................................................17

*Campbell v. UniU.S. Department of Justice,*
   164 F.3d 20 (D.C.Cir.1998) .................................................................................12

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ...............................................................................................6

*Chambers v. U.S. Department of Interior,*
   568 F.3d 998 (D.C. Cir. 2009) ...............................................................................6

*Center for Biological Diversity v. Office of Management and Budget,*
   2008 WL 5129417 (N.D. Cal. 2008) .............................................14, 15, 18, 19

*Center for National Security Studies v. U.S. Department of Justice,*
   215 F. Supp.2d 94 (D.D.C.2002) ........................................................................12

*Ecological Rights Foundation v. Federal Emergency Management Agency,*
   No. 16-cv-05254-MEJ, 2017 WL 5972702 (N.D. Cal. Nov. 30, 2017) .................6, 13, 17, 19

*Electronic Privacy Information Center v. Department of Justice,*
   416 F. Supp. 2d 30 (D.D.C. 2006) .........................................................................9

*Environmental Protection Agency v. Mink,*
   410 U.S. 73 (1973) ...............................................................................................5

*Federal Election Commission v. Akins,*
   524 U.S. 11 (1998) ...............................................................................................8

*Fiduccia v. Department of Justice,*
   185 F.3d 1035 (9th Cir. 1999) .........................................................................7, 12

ii

*Gahagan v. U.S. Citizenship & Immigration Services,*
   No. CIV.A. 15-796, 2015 WL 6738549 (E.D. La. Nov. 4, 2015) ..........................................16

*Gilmore v. Department of Energy,*
   33 F. Supp. 2d 1184 (N.D. Cal. 1998) ............................................................5, 7, 8

*Hamdan v. U.S. Department of Justice,*
   797 F.3d 759 (9th Cir. 2015) ................................................................10, 21

*Judicial Watch, Inc. v. Food & Drug Administration,*
   449 F.3d 141 (D.C. Cir. 2006) ........................................................................6

*Lion Raisins v. U.S. Department of Agriculture,*
   354 F.3d 1072 (9th Cir. 2004) ........................................................................6

*National Labor Relations Board v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) ....................................................................................5

*Natural Resources Defense Council, Inc. v. United States EPA,*
   966 F.2d 1292 (9th Cir.1992) ........................................................................8

*National Wildlife Federation v. U.S. Forest Service,*
   861 F.2d 1114 (9th Cir. 1988) ....................................................................18, 19

*National Labor Relations Board. v. Robbins Tire & Rubber Co.,*
   437 U.S. 214 (1978) ....................................................................................1

*Our Children's Earth Foundation v. National Marine Fisheries Service,*
   2015 WL 4452136 (N.D. Cal. Jul. 20, 2015) ..................................................7

*Patterson v. Internal Revenue Service,*
   56 F.3d 832 (7th Cir. 1995) ............................................................................6

*Rosenfeld v. U.S. Dept. of Justice,*
   57 F.3d 803 (9th Cir. 1995) ..........................................................................21

*S. Yuba River Citizens League v. National Marine Fisheries Service,*
   2008 WL 2523819 (E.D. Cal. Jun. 20, 2008) ................................................7

*Stevens v. Dep't of Homeland Security,*
   2020 WL 1701882 (N.D. Ill. Apr. 4, 2020) ..................................................20

*Truit v. Dep't of State,*
   897 F.2d 540 (D.C. Cir. 1990) ......................................................................10

*Valencia-Lucana v. U.S. Coast Guard,*
   180 F.3d 321 (D.C. Cir. 1999) ..................................................................10, 12

*Willamette Industries, Inc. v. U.S.,*
   689 F.2d 865 (9th Cir. 1982) ........................................................................12

*Yonemoto v. Dept. of Veterans Affairs,*
   686 F.3d 681 (9th Cir. 20120) ........................................................6, 12, 13, 17

*Zemansky v. U.S. Envtl. Prot. Agency,*
   767 F.2d 569 (9th Cir. 1985) ..................................................................6, 7, 10

**Statutes**

5 U.S.C. § 552(a)(3)(A) ..................................................................................5, 6, 7

5 U.S.C. § 552(a)(3)(C) ..................................................................................7, 9-10

5 U.S.C. § 552(a)(4)(B) ..................................................................................6, 12, 13

5 U.S.C. § 552(a)(6)(A) ..................................................................................8

5 U.S.C. § 552(a)(6)(A)(i) ..............................................................................8, 13, 14

5 U.S.C. § 552(a)(6)(A)(ii) .............................................................................8

5 U.S.C § 552(a)(6)(C) ...................................................................................7

5 U.S.C. § 552(a)(6)(C)(ii) .............................................................................7

5 U.S.C. §§ 552(a)(6)(E)(i) ............................................................................8

5 U.S.C. § 552(b) .......................................................................................15, 18, 20

5 U.S.C. § 552(b)(5) .....................................................................................18

5 U.S.C. § 552 *et. seq* .................................................................................2

6 C.F.R. § 5.5(e)(1)(iv) ..................................................................................9

6 C.F.R. § 5.5(e)(2) §§ 5.1 *et seq.* .................................................................8

**Other Authorities**

Fed. R. Civ. P. 56 ........................................................................................1

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT Plaintiffs Transgender Law Center and Joleen K. Youngers, by their attorneys, Shawn Thomas Meerkamper, Andrew R. Free, and Grant & Eisenhofer P.A., move this Court for an order granting summary judgment in favor of Plaintiffs on all claims and against Defendants United States Immigration and Customs Enforcement and United States Department of Homeland Security Office for Civil Rights and Civil Liberties, and for such other and further relief as this Court deems appropriate, pursuant to Fed. R. Civ. P. 56.

## RELIEF SOUGHT

Plaintiffs request an Order granting Plaintiffs' Motion for Summary Judgment in its entirety, dismissing Defendants' Motion for Summary Judgment in its entirety, and for such other and further relief as the Court deems appropriate.

Date: September 21, 2020                    Respectfully submitted,

_/S/ R. Andrew Free_
R. ANDREW FREE*
    TN Bar No. 30513
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
Phone: (844) 321-3221
Fax: (615) 829-8959
Andrew@ImmigrantCivilRights.com
*Admitted Pro Hac Vice*

Shawn Thomas Meerkamper
    (CA Bar No. 296964)
Transgender Law Center
P.O. Box 70976
Oakland, CA, 94612
Phone: (510) 587-9696, ext. 303
Fax: (510) 587-9699
shawn@transgenderlawcenter.org

Kimberly A. Evans*
    DE Bar No. 5888
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
Phone: (302) 622-7086
Fax: (302) 622-7100
kevans@gelaw.com
*Pro Hac Vice Admission Forthcoming*

*Counsel for the Plaintiffs*

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

The Freedom of Information Act ("FOIA") seeks to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Plaintiffs, however, have waited almost *1.5 years* for an adequate and complete response to their FOIA requests which seek records related to the imprisonment and death of a 33-year-old transgender asylum-seeker, Roxsana Hernandez ("Roxsana"), from Defendants, two agency components of the Department of Homeland Security ("DHS")—U.S. Immigration and Customs Enforcement ("ICE") and the Office of Civil Rights and Civil Liberties ("CRCL").  After receiving *no* response to their FOIA requests, Plaintiffs were forced to file this action to compel production of records unlawfully withheld and enjoin Defendants from their continuing violations of the FOIA.

Congress imposed strict and short deadlines for agency responses to FOIA requests to ensure the public is kept timely informed. Defendants' actions, however, have made a mockery of these deadlines—it was not until the initiation of this very action that ICE even located Plaintiffs' request. *See* ECF No. 38 at Attachment #1, ¶6 (Declaration of Fernando Pineiro, hereinafter "Pinerio Decl."). Exacerbating the delay, after this action was filed and Defendants finally started to produce documents, it became evident they did not conduct an adequate search and withheld documents without adequate justification. The Court's intervention is necessary to bring Defendants back within the law and to ensure Plaintiffs receive the information to which they are entitled under the FOIA.

## II.     STATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND[1]

On January 29, 2019, Plaintiffs submitted a FOIA request to ICE for, *inter alia*, all documents pertaining to Roxsana, including several search terms (the "January 2019 Request"). *See* Melchert Decl. at ¶6 and Ex. A. To date, Plaintiffs have received no acknowledgment from

---

[1] Plaintiffs respectfully direct the Court to the Facts section of the Complaint for a full recitation of the facts of this case. *See* ECF No. 1.

ICE to their request, a fact uncontroverted by Defendants. *Id.* at ¶8; Pineiro Decl. at ¶6 ("Plaintiffs' FOIA request was not located until Plaintiffs filed the Complaint in this case on May 31, 2019."). On February 5, 2019, Plaintiffs submitted a FOIA request to CRCL for all investigations into the circumstances surrounding the death of Roxsana (the "February 2019 Request," and, together with the January 2019 Request, the "FOIA Requests"). *See* Melchert Decl. at ¶7 and Ex. B. On April 19, 2019, Plaintiffs received an acknowledgment letter from CRCL, almost three months after the request was submitted. *See id.* at ¶9 and Ex. C.

Having received no records from either agency, on May 31, 2019, Plaintiffs initiated the instant action (the "Action") pursuant to 5 U.S.C. § 552 *et. seq. See* ECF No. 1; Melchert Decl. at ¶10. On August 19, 2019, over six months after Plaintiffs made the FOIA Requests, counsel for the parties met and conferred as ordered by the Court. Melchert Decl. at ¶11. During this meeting, Defendants represented that: 1) ICE had identified around 3,100 responsive records that were partially subject to release, and CRCL had identified approximately 631 pages; and 2) Defendants expected to release 500 documents per month, starting at the end of September 2019. *Id.* Defendants also made this representation to the Court in the Parties' joint case management statement ("CMS") on September 3, 2019. *See* ECF No. 15, at p. 5 (Defendants "anticipate *releasing* 500 pages monthly beginning at the end of September . . . . Thus, ICE anticipates that its release will be completed six months later, in February 20[20]. Defendants can process 500 pages monthly due to limited government resources, and can provide a declaration explaining those resources, if requested.") (emphasis added). Plaintiffs were skeptical of Defendants' representation, as Plaintiffs' knew of other FOIA cases where ICE or DHS was ordered or stipulated to producing significantly more than 500 pages per month. Melchert Decl. at ¶11.

Also during this meet and confer, Plaintiffs inquired about the agency components and subcomponents Defendants tasked with searches. *Id.* Defendants represented that they did not know. Plaintiffs then provided Defendants with a list of agency components likely to contain relevant records, based on what Plaintiffs already knew about Roxsana's journey (the "Components List"). *Id.* at ¶12. Plaintiffs also asked whether any investigations related to Roxsana's death were ongoing. *Id.* at ¶13.  Plaintiffs received records from DHS's Office of

2

Civil Action No.: 3:19-cv-03032-SK                    Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
                                                      and Opposition to Defendants' Motion for Summary Judgment

Inspector General ("OIG") that indicated it did not have any open case. *Id.* Likewise, ICE made no media representations indicating any investigation was ongoing. *Id.*

On September 9, 2019, the Parties spoke about their positions on the number of pages to be produced. *Id.* at ¶15. Plaintiffs again asked Defendants which components had been searched and again provided the Components List. *Id.* Plaintiffs also explained that they sought three critical documents related to Roxsana, all of which are required to be created by ICE in the event of an in-custody death, including Roxsana's: 1) detainee death review, a document mandated to be published by Congress within 90 days of an in-custody death; 2) mortality or morbidity review;[2] and 3) root cause analysis (the "RCA").[3] *Id.* at ¶16. On September 10, 2019, Plaintiffs again emailed Defendants the Components List. *See id.* at ¶17 and Ex. D. On September 25, 2019, Defendants sent a letter to Plaintiffs stating Defendants would agree to release 750 pages a month if Plaintiffs would forego a motion for summary judgment. *Id.* at Ex. E. This letter also stated: "ICE can confirm that it has and/or will search for potentially responsive records from each of the custodians listed in your September 10, 2019 email." *Id.* at ¶18 and Ex. E.

On September 30, 2019, CRCL produced 12 pages of records of the 631 pages identified by the agency. *Id.* at ¶20. Five and a half months later, on March 12, 2020, DHS produced 20 pages in a "supplemental response." *Id.* On July 27, 2020, Plaintiffs received another "supplemental response" of 114 pages—*a year and a half after Plaintiffs' initial request*. *Id.* On October 2, 2019, Plaintiffs received 337 pages from ICE—the first records produced by the agency since Plaintiffs' FOIA request submitted eight months prior. *Id.* at ¶21.

---

[2] *See* IHSC Operations Memorandum (OM) 16-007 (Mar. 18, 2016) ("A clinical mortality review is conducted to determine the appropriateness of the clinical care provided and the effectiveness of the facility's policies and procedures relevant to the circumstances surrounding the death.") available at https://www.documentcloud.org/documents/6025551-IHSC-Operations-Memorandum-Mortality-Review.html. *See also* IHSC Mortality Review for Jeancarlo Jimenez-Joseph (Dec. 15, 2017), available at https://www.documentcloud.org/documents/6825788-Jimenez-Mortality-Review.html.

[3] *See* IHSC, *Root Cause Analysis Guide* (Mar. 25, 2016) ("Root Cause Analysis (RCA) is the process for identifying the basic or contributing causal factor(s) associated with adverse and/or sentinel events. The review is interdisciplinary and includes those who are closest to the process. It identifies changes that could be made in systems and processes to improve performance, promote positive outcomes, and reduce the risk of adverse events or recurrence of close calls. The RCA process helps to identify what, how and why an event occurred."), available at https://www.documentcloud.org/documents/6025505-IHSC-Root-Cause-Analysis-Guide.html. *See also* IHSC Root Cause Analysis, RCA Action Plan, and RCA Action Plan Feedback for Jeancarlo Jimenez-Joseph, available at https://www.documentcloud.org/documents/6825789-Jimenez-Root-Cause-Analysis.html.

3

Contrary to ICE's representation that it would produce 500 pages per month, ICE instead *reviewed* 500 pages per month, releasing only documents the agency deemed non-exempt and non-duplicative without any explanation as to how duplicity was determined, and resulting in monthly productions that were sometimes as scant as 16 pages total. *Id.* at ¶22. Plaintiffs repeatedly requested that Defendants provide an affidavit detailing the methods used to deem records duplicative or nonresponsive, Defendants have refused to comply. *Id.* And despite Defendants' representation that all responsive, non-duplicative documents would be produced by February 2020, their productions are not yet complete, as Plaintiffs have continued to receive documents from Defendants as recently as August 27, 2020—*over two years after Roxsana's death and nearly nineteen months after Plaintiffs made the FOIA requests*. *Id.* at ¶24.

By January 2020, it became clear from ICE's document productions, which did not include a mortality review or a RCA, that it had not adequately responded to the FOIA Requests. *Id.* at ¶25. Given the inadequacy of the documents Defendants' produced, on January 14, 2020, Plaintiffs submitted another FOIA request to uncover documents that would show how Defendants had tasked their searches (the "January 2020 Request"). *Id.* at Ex. G. The January 2020 Request also requested expedited processing because the request, among other things, "implicates significant due process rights for [TLC's] office, the estate of Ms. Hernandez, and for [Plaintiffs'] clients, the surviving siblings of Ms. Hernandez," and Defendants' delay in responding to the FOIA Requests was delaying and otherwise impacting other related lawsuits filed by Plaintiffs involving Roxsana. *Id.* On February 10, 2020, ICE sent an acknowledgment letter regarding the January 2020 Request. *Id.* at Ex. H. To date, Plaintiffs have not received any documents pursuant to the January 2020 Request. *Id.* at ¶28.

On August 17, 2020, after the parties were unable to reach a mutually agreeable settlement during court-ordered mediation on that day, and still lacking the RCA and drafts of the mortality review, Plaintiffs requested expedited processing of the FOIA Requests by email to Defendants. *Id.* at Ex. J. Defendants responded only to state that Plaintiffs could submit a new FOIA request, but did not respond regarding Plaintiffs' expedited processing request. *Id.*

Plaintiffs also initiated a separate action under the New Mexico Inspection of Public Records Act ("IPRA") against CoreCivic, the ICE contractor that was responsible for Roxsana's custody and care when she died (the "CoreCivic Documents"). *Id.* at ¶41. In response to their IPRA request, Plaintiffs received hundreds of documents from CoreCivic, including memoranda and emails from ICE officials and offices that were not produced in the instant action. *Id.* at Ex. L-O.

## III.    THE PURPOSE AND INTENT OF THE FOIA

The purpose and intent of the FOIA is "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975); *EPA v. Mink*, 410 U.S. 73, 79-90 (1973). "Without question, the [FOIA] is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Mink*, 410 U.S. at 80. Ensuring the public's timely access to government records was a particular focus of Congress in enacting the FOIA. In fact, Congress specifically amended the FOIA to address the most frequent complaint about its operation—agency delays in responding to FOIA requests. *Gilmore v. Dep't of Energy*, 33 F. Supp. 2d 1184, 1185, 1187 (N.D. Cal. 1998) ("Congress has repeatedly stressed the need for timely compliance with the requirements of the FOIA."). "[I]nformation is often useful only if it is timely. Thus, excessive delay by the agency in its response is often tantamount to denial.  It is the intent of this bill that the affected agencies be required to respond to inquiries and administrative appeals within specific time limits." *Id.* at 1187. "There can be no doubt that Congress took these deadlines very seriously." *Id.*

Defendants' interpretation of Congress's mandate and timing structure, which essentially posits that a FOIA requester can wait *years* for completion of a FOIA request so long as the agency trickles out a handful of documents per month under a timeline that—by Defendants' own words— is "impossible" to estimate, would render the requirements of Section 552(a)(3)(A) effectively meaningless.  This is not the intent of the FOIA, and Defendants' interpretation should be rejected.

5

Civil Action No.: 3:19-cv-03032-SK                                    Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
                                                                      and Opposition to Defendants' Motion for Summary Judgment

1  **IV.  LEGAL STANDARD**

2          Summary judgment is appropriate when the moving party affirmatively establishes that

3  there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  In

4  deciding a motion for summary judgment, the Court must view all of the facts and make all

5  reasonable inferences in the moving party's favor.  *Becker v. IRS,* 34 F.3d 398, 405 (7th Cir. 1994)

6  (citing *Zemansky v. U.S. Envtl. Prot. Agency,* 767 F.2d 569, 571 (9th Cir. 1985)); *see also Celotex*

7  *Corp.*, 477 U.S. at 323.

8          FOIA cases are typically decided on motions for summary judgment. *Yonemoto v. Dept. of*

9  *Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 20120); *Ecological Rights Found. v. Fed. Emergency*

10  *Mgmt. Agency*, No. 16-cv-05254-MEJ, 2017 WL 5972702, at *3 (N.D. Cal. Nov. 30, 2017).

11  Because of the "asymmetrical distribution of knowledge" in FOIA cases, "where the agency alone

12  possesses, reviews, discloses, and withholds the subject matter of the request," *Judicial Watch,*

13  *Inc. v. FDA,* 449 F.3d 141, 146 (D.C. Cir. 2006), the agency bears the burden of establishing that

14  its search was adequate and each of its asserted withholdings are proper. *Chambers v. U.S. Dept.*

15  *of Interior,* 568 F.3d 998, 1003 (D.C. Cir. 2009); *Patterson v. IRS,* 56 F.3d 832, 835–36, 840 (7th

16  Cir. 1995). Defendants bear this burden notwithstanding the fact that Plaintiffs have also moved

17  for partial summary judgment. *See* 5 U.S.C. § 552(a)(4)(B). Moreover, the Court may award

18  summary judgment in FOIA cases solely based on information provided in affidavits or

19  declarations so long as the affiants are knowledgeable about the information sought and the

20  affidavits are detailed enough to allow the Court to independently assess whether an agency has

21  complied with FOIA. *Lion Raisins v. U.S. Dept. of Agriculture*, 354 F.3d 1072, 1079 (9th Cir.

22  2004).

23  **V.      ARGUMENT**

24          **A.      DEFENDANTS FAILED TO MAKE RESPONSIVE DOCUMENTS PROMPTLY
                     AVAILABLE AND PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT**
25                   **THAT DEFENDANTS' FAILED TO COMPLY WITH FOIA DEADLINES**

26          It is undisputed that Defendants failed to do what Congress requires of all agencies in

27  receipt of properly-directed FOIA requests: make non-exempt agency records "promptly

28  available." 5 U.S.C. § 552(a)(3)(A). Agencies in receipt of properly-directed FOIA requests are

6

under an *obligation* to ensure that they adequately search for and *promptly* make available responsive records. *See* 5 U.S.C. §§ 552(a)(3)(A), 552(a)(3)(C); *Zemansky*, 767 F.2d at 571. Failure to make a timely determination about the disclosure of documents, regardless of whether that agency later makes a legitimate decision to withhold relevant documents, is nonetheless an improper withholding in violation of the FOIA. *See Gilmore*, 33 F. Supp. 2d at 1188. To be excused from the "promptly" requirement, Defendants must show exceptional circumstances justifying the delay. 5 U.S.C § 552(a)(6)(C). While "exceptional circumstances" are not defined, the FOIA provides that such exceptional circumstances *cannot include* "a delay that results from a predictable agency workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

The uncontroverted record shows that Defendants' search was far from adequate and their proposed disclosure schedule was not "prompt[]," as the FOIA requires. Plaintiffs' submitted the FOIA Requests on January 27, 2019 and February 5, 2019, *almost 1.5 years ago*. Melchert Decl. at ¶¶6-7, and Ex. A, B. Defendants did not produce a single document in response to these requests until the instant action was initiated in May 2019. *Id.* at ¶¶10, 20, 21. In fact, ICE did not even locate Plaintiffs' FOIA request until after this action was initiated, a fact not disputed by ICE. *Id.* at ¶8; Pineiro Decl. at ¶6. Moreover, the scant documents Defendants have produced have obvious deficiencies, including inadequate searching and the absence of critical documents to which Plaintiffs' are entitled, including the RCA and all drafts of Roxsana's detainee death review.

Nor is there any justification for Defendants' delay. *See, e.g.*, *Fiduccia v. DOJ*, 185 F.3d 1035, 1041 (9th Cir. 1999) ("Congress gave agencies 20 *days*, not years, to decide whether to comply with requests and notify the requesters[.]") (emphasis in original). The text of Section 552(a)(3)(A) is unambiguous—Defendants must make the records Plaintiffs seek available promptly, which *does not* mean almost 1.5 years later. *See Gilmore*, 33 F. Supp. 2d at 1185 (granting summary judgment to FOIA requester following 5-month agency delay); *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 2015 WL 4452136 at *8 (N.D. Cal. Jul. 20, 2015) ("[T]he [agencies'] failure to comply with the FOIA's time limits is, by itself, a violation of the FOIA."); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2008 WL 2523819 at *5

7

Civil Action No.: 3:19-cv-03032-SK                    Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
                                                       and Opposition to Defendants' Motion for Summary Judgment

1  (E.D. Cal. Jun. 20, 2008) (same). Plaintiffs are thus entitled to summary judgment regarding

2  Defendants' violation of the FOIA's promptly available requirement.

3       For the same reasoning, Plaintiffs are also entitled to a declaratory judgment that

4  Defendants violated the FOIA's deadlines. Declaratory judgment is proper when there are purely

5  legal questions at issue and the judgment will clarify the legal issues and provide clarity to the

6  parties and the public. *Nat. Res. Def. Council, Inc. v. United States EPA* ("NRDC"), 966 F.2d

7  1292, 1299 (9th Cir.1992); *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174–

8  75 (9th Cir. 2002). Likewise, declaratory judgment is appropriate when an agency has ignored

9  statutory deadlines. *See, e.g.*, *NRDC*, 966 F.2d at 1299; *Fed. Election Commission v. Akins*, 524

10 U.S. 11, 21 (1998) (a "plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain

11 information which must be publicly disclosed pursuant to a statute."); *Gilmore,* 33 F. Supp. 2d at

12 1189 (agency's failure to process FOIA request in a timely manner was itself an injury).

13      Here, the record is beyond dispute: Defendants failed to satisfy the requirements of 5

14 U.S.C. § 552(a)(6)(A) within the statutory deadlines. CRCL provided their determinations and

15 acknowledgment letter on April 19, 2019, *46 days after the statutory deadline* for providing

16 determinations and *76 days* after the request was sent. Melchert Decl. at Ex. C. CRCL did not

17 provide any responsive documents until September 30, 2019, *almost eight months after submission*

18 *of the request. Id.* at ¶20. ICE did not even *locate* Plaintiffs' FOIA request until Plaintiffs initiated

19 this action in May 2019—121 days after the statutory deadline for making determinations had

20 passed. Pineiro Decl. at ¶6.  Nor did ICE produce any responsive documents to Plaintiffs request

21 until October 2, 2019, *almost 9 months after submission of the request. Id.* at ¶21. Thus, a

22 declaratory judgment stating Defendants violated the FOIA by failing to comply with the statutory

23 deadlines set forth in 5 U.S.C. § 552(a)(6)(A)(i) and (ii) is appropriate.

24 **B.    DEFENDANTS UNLAWFULLY DENIED PLAINTIFFS' EXPEDITED PROCESSING**
   **REQUESTS**

25      5 U.S.C. §§ 552(a)(6)(E)(i) and 552(a)(6)(E)(i)(II) require DHS to promulgate requests for

26 expedited processing and determine which cases deserve such expedited treatment. DHS

27 promulgated such regulations at 6 C.F.R. §§ 5.1 *et seq.*  6 C.F.R. § 5.5(e)(2) provides that a request

28 for expedited processing "may be made at any time." 6 C.F.R. § 5.5(e)(1)(iv) provides for

8

expediting processing of FOIA requests regarding "a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence." "[A] prima facie showing of agency delay exists when an agency fails to process an expedited FOIA request within the time limit applicable to standard FOIA requests." *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 39 (D.D.C. 2006). Although Defendants either denied or did not respond to Plaintiffs' expediting processing requests, Plaintiffs have waited for 1.5 years for compliance with this request—which is an uncontroverted violation of the FOIA. *See* Melchert Decl. at ¶¶27, 30. Similarly, Plaintiffs' request here is of tremendous public concern. *See* Egyes Decl. at ¶¶14-16.

Plaintiffs' January 2020 Request was entitled to expedited processing. The January 2020 Request explained the urgency in receiving the requested documents due to the overwhelming public interest in Roxsana's case, especially when it became publicly-known that relevant video surveillance footage of Roxsana had "disappeared" despite written requests requiring its preservation. *See* Melchert Decl. at Ex. G; Egyes Decl. at ¶¶12, 14. This revelation sparked outrage and increased demands for accountability, including requests from Senators Harris and Blumenthal that Attorney General Barr appoint special counsel to investigate the matter. Egyes Decl. at Ex. A. Despite these facts, Defendants denied this request on February 10, 2020 (*see* Melchert Decl. at Ex. H) and never produced any records in response. *Id.* at ¶28.

Plaintiffs' second expedited processing request on August 17, 2020 should similarly have been granted. Plaintiffs clearly established that the circumstances surrounding Roxsana's death were and continue to be, without question, a matter of "widespread and exceptional media interest." *See* Egyes Decl. at ¶¶10-11, 15-16, 20; Melchert Decl. at Ex. G, J. Plaintiffs' August 2020 request cited 26 news articles about unanswered questions surrounding Roxsana's death and six inquiries by members of Congress calling for investigation and accountability. *See id.* Thus, there can be no question that the request was entitled to expedited processing.

### C.  DEFENDANTS FAILED TO CONDUCT AN ADEQUATE SEARCH

Defendants must conduct a reasonable search for documents responsive to the FOIA Requests using methods that are reasonably expected to produce all existing documents. 5 U.S.C.

9

Civil Action No.: 3:19-cv-03032-SK          Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
                                            and Opposition to Defendants' Motion for Summary Judgment

§ 552(a)(3)(C); *Zemansky*, 767 F.2d at 571.  In doing so, Defendants are required to construe FOIA requests liberally. *Truit v. Dep't of State*, 897 F.2d 540, 544-45 (D.C. Cir. 1990). In order to conduct an "adequate search" as required by the FOIA, the agency must:

> Demonstrate that it has conducted a "search reasonably calculated to uncover all relevant documents."  Further, the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.  The adequacy of the search in turn is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case.  In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith.

*Zemansky*, 767 F.2d at 571 (quoting *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)) (emphasis in original). "[If] a review of the record raises substantial doubt, particularly in view of well-defined requests and positive indications of overlooked materials, summary judgment is appropriate." *Hamdan v. U.S. Dept. of Justice*, 797 F.3d 759, 771 (9th Cir. 2015) (quoting *Duenas Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003)). Defendants failed to carry out an adequate search by (1) failing to conduct an iterative review and (2) failing to task enterprise and individual level accounts Plaintiffs' identified, which was (3) evidenced by the multitude of CoreCivic Documents that should have been, but were not, included in Defendants' productions.

The FOIA requires that Defendants conduct more than a perfunctory search that is reasonably calculated to produce the documents requested, and in doing so must follow obvious leads to discovery of requested documents. *See Zemansky*, 767 F.2d at 571; *Valencia-Lucana v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). Defendants failed to do either. On September 9, 2019, Plaintiffs identified three key documents sought: (1) the detainee death review, (2) the mortality review, and (3) the RCA. *See* Melchert Decl. at ¶16. Six months later, Plaintiffs still had not received the RCA, prompting the January 2020 Request related to how Defendants had tasked its searches in responding to the January 2019 and February 2019 FOIA Requests. *See id.* at Ex. G. Despite Plaintiffs raising these failures on multiple occasions, Plaintiffs still have not received the RCA, a year and half after making their initial requests. *See id.* at ¶37.

Defendants' failure to carry out an iterative review exemplifies precisely why there is a need for the government to engage in such a process.  Plaintiffs' persistent requests that Defendants

search additional custodians resulted in the location of thousands of pages of additional documents that should have been located by Defendants on their own accord, a fact Defendants do not dispute. *See* Defendants' Brief at 6-8 (explaining numerous additional documents were located in response to Plaintiffs' September 9, 2019 letter that named additional custodians to search). Defendants also admit that ICE did not produce documents gathered during the investigative stage of the RCA, which were later located and produced to Plaintiffs:

> On April 17, 2020, Plaintiffs notified ICE that they believed working documents that went into the Mortality Review and the Root Cause Analysis and associated records were not produced. In response, ICE contacted the ICE Health Services Corps . . . [which] located 5 pages and 1 excel spreadsheet . . . on an individual employee's hard drive *that had been overlooked by the employee that had conducted the search previously*." Pineiro Decl. at ¶11 (emphasis added).

These supplemental materials evidence that an RCA process was started. *See* Melchert Decl. at Ex. K. None of the produced documents indicate any determination not to carry out an RCA, as required, nor have Defendants provided a sworn declaration stating as such in connection with Plaintiffs' requests. *See* Melchert Decl. at ¶37 and Ex. K. While Defendants now conveniently claim that no RCA was conducted, Pineiro Decl. at ¶11, the absence of the RCA, in light of the fact that the supplemental production revealed that an RCA process had been started, evidences that Defendants' search was patently inadequate.

Defendants' failure to conduct an iterative review and task relevant enterprise and individual email accounts is also supported by the significant discrepancies between the CoreCivic Documents and the entirety of Defendants' production.  *See* Melchert Decl. ¶42 and Ex. L. Plaintiffs compiled a list of all documents produced by CoreCivic that were not produced by ICE, which revealed a total of 162 records not produced by ICE. *See id.* at Ex. L. There were also 19 pages missing from records ICE partially produced that CoreCivic produced in their entirety. *Id.* For example, CoreCivic produced several emails to ICE employees with daily rosters during the dates Roxsana was in their custody that ICE did not produce. *See id.* at Ex. M. CoreCivic also produced emails with daily updates about Roxsana's condition while hospitalized that were sent to ICE employees, which were also not produced by ICE. *See id.* at Ex. N. Plaintiffs also compiled a list of all individual and enterprise level ICE and DHS email accounts that were included in the CoreCivic Documents but not ICE's productions. *See id.* at Ex. P.  A similar comparison between

11

the CoreCivic Documents and CRCL's productions revealed that CRCL failed to produce several emails pertaining to CRCL's site visit to Cibola County Correctional Center. *See* Melchert Decl. Ex. O. Defendants should have most, if not all, of the CoreCivic Documents, as CoreCivic was hired by ICE to carry out ICE's official duties. The discrepancies between Defendants' production and the CoreCivic Documents evidences Defendants did not carry out an adequate search or an iterative review as required.

Because Defendant failed to: (i) perform an iterative review, (ii) task enterprise and individual level accounts, and (iii) produce known key materials and documents, in addition to the vast discrepancies evidenced by the CoreCivic Documents, Plaintiffs have presented "positive indications of overlooked materials," thus shifting the summary judgment burden to Defendants to justify its search. *Valencia-Lucana,* 180 F.3d at 326; *Campbell v. UniU.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C.Cir.1998) (search was inadequate when agency's produced documents revealed that searching other records might uncover the documents sought); *Ctr. for Nat'l Security Studies v. U.S. Dept. of Justice*, 215 F. Supp.2d 94, 110 (D.D.C.2002) (finding search inadequate where disclosed document clearly indicated existence of earlier, relevant undisclosed documents). Defendants have not justified the adequacy of their search, and summary judgment should be granted in Plaintiffs' favor.

D.    **DEFENDANTS IMPROPERLY WITHHELD AGENCY RECORDS WITHOUT PROPER EXEMPTION SHOWINGS**

The FOIA provides a strong presumption in favor of disclosure and exemptions are to be interpreted narrowly. *Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir.1992); *Church of Scientology v. U.S. Dep't. of the Army*, 611 F.2d 738, 742 (9th Cir. 1979). Government agencies bear the burden of proof to show that any withheld documents are properly exempt from disclosure. 5 U.S.C. § 552(a)(4)(B); *Yonemoto*, 686 F.3d at 688; *Willamette Industries, Inc. v. U.S.*, 689 F.2d 865, 868 (9th Cir. 1982). When an agency withholds documents under a claim of exemption, it must "notify the person making such request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i) (emphasis added); *see Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1043 (9th Cir. 1999) (5 U.S.C. § 552(a)(6)(A)(i) "requires that the agency provide enough information, presented with sufficient detail, clarity, and verification, so

12

Civil Action No.: 3:19-cv-03032-SK    Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
and Opposition to Defendants' Motion for Summary Judgment

that the requester can fairly determine what has not been produced and why, and the court can decide whether the exemptions claimed justify the nondisclosure.").

To satisfy their burden on summary judgment, Defendants are required to submit a *Vaughn* index along with "'detailed public affidavits' that, together, 'identify [ ] the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption.'" *Ecological Rights Found*, 2017 WL 5972702, at *3) (quoting *Yonemoto*, 686 F.3d at 688) (alterations in original). Both the *Vaughn* index and Defendants' declarations must be from "'affiants who are knowledgeable about the information sought' and 'detailed enough to allow a court to make an independent assessment of the government's claim of exemption.'" *Id.* at *3 (quoting *Yonemoto*, 686 F.3d at 688); *see also* 5 U.S.C. § 552(a)(4)(B). The *Vaughn* index should "reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection." *Id.* Moreover, while "the [agency's] reasons are entitled to deference, the [agency's] declarations must still describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [the agency's] bad faith. The [agency] must do more than show simply that it has acted in good faith." *Id.* (quoting *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007)). "A basic policy of FOIA is to ensure that Congress *and not administrative agencies* determines what information is confidential. . . . As such, courts do not defer to a federal agency's determination that the requested information falls under a particular FOIA exemption." *Id.* (quoting *Lessner v. U.S. Dept. of Commerce*, 827 F.2d 1333, 1335 (9th Cir. 1987); *Carlson v. U.S. Postal Serv.*, 504 F.3d 1123, 1127 (9th Cir. 2007)).

Here, almost every single document produced by Defendants is redacted or is withheld in its entirety. *See* Pineiro Decl. at Ex. A; ECF No. 38 at Attachment #2, Ex. G (each a "*Vaughn* Index" and together the "*Vaughn* Indices"). Despite this fact, Defendants' *Vaughn* Indices and declarations related thereto do not provide either Plaintiffs or this Court with sufficient information to determine what was not produced and why, nor did Defendants adequately explain why any

13

Civil Action No.: 3:19-cv-03032-SK                    Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
and Opposition to Defendants' Motion for Summary Judgment

withheld document legitimately qualified for exemption as required by 5 U.S.C. § 552(a)(6)(A)(i). *See id.*

### 1.     Defendants' Vaughn Index Lacks Such Specificity That They Fail to Allow Determination of whether Exemptions are Properly Invoked

This Court has previously rejected "boilerplate explanations" for entries in a *Vaughn* index, where "documents that [are] of the same type [are] given the same explanation for the withholding." *Ctr. for Biological Diversity v. Office of Mgmt. and Budget*, 2008 WL 5129417, *7 (N.D. Cal. 2008). Where a *Vaughn* index "relies on boilerplate explanations to claim exemption and does not provide a single particularized claim of exemption to any document," it should be rejected as failing to provide sufficient facts for the court to conduct a *de novo* review of a defendant's withholdings." *Id.* Even a cursory review of Defendants' *Vaughn* Indices evidences that Defendants similarly made "no effort . . . to tailor the explanation to the specific document withheld" and "replicated [the same explanation] verbatim throughout the index." *Id.*

A particularly egregious example of Defendants' boilerplate and meaningless explanations for withholding is evidenced by CRCL's Vaughn Index which states: "DHS applied FOIA Exemption (b)(5) to protect deliberative information contained in email outlining CRCL's investigation" in attempting to justify withholding five paragraphs of one email that constitute all substantive responses to the questions contained therein. ECF No. 38 at Attachment #2, Ex. E, p. 30; Melchert Decl. Ex. V. This explanation fails to provide any information to verify the nature of the redacted information. Because the agency redacted the domains of the email addresses of both senders and recipients, it is also impossible to test the veracity of this assertion. Plaintiffs annotated Defendants' Vaughn Indices highlighting all redactions challenged for this reason. *See* Melchert Decl. at Ex. ZZ.

For these reasons along, Defendants' *Vaughn* Indices should be rejected as insufficient, as Defendants have not provided the specificity necessary for Plaintiffs and the Court to determine whether Defendants have met their burden for invocation of FOIA exemptions for the withheld or redacted documents, nor have they made any effort to identify or set forth the agency's position as to any specific withholdings

14

Civil Action No.: 3:19-cv-03032-SK          Plaintiffs' Notice of Motion and Cross-Motion for Summary Judgment
and Opposition to Defendants' Motion for Summary Judgment

## 2.    Defendants Failed to Reasonably Segregate Non-Exempt Information

The FOIA mandates that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b); *see Ctr. for Biological Diversity*, 2008 WL 5129417 at *9. "Segregability is of particular concern to the plaintiff with regard to e-mails containing data.  Reasonably segregable facts and data are exactly what plaintiff seeks-and is entitled to in its FOIA request." *Id.* at *9. Where the *Vaughn* index provides only "boilerplate segregability language without a 'detailed justification' for the withholding of the portions of exempt records" it denies Plaintiffs both "the opportunity to argue for [the document's] release and the court the opportunity to consider the reasonableness of the withholding." *Id.* Defendants must also "document any inability on its part to parse the records, such that incomplete segments of records would be rendered meaningless if disclosed."  *Id.* "The government [ ] bears the burden of justifying nondisclosure of any withheld records or segments of records."  *Id.*

Defendants' *Vaughn* Indices evidence a total failure to segregate factual and other information. ICE withheld the domain names following several email addresses (e.g., @ice.dhs.gov), making it impossible to determine whether recipients of responsive documents were agency employees, thus making it impossible to test ICE's assertion of both the deliberative process privilege ("DPP") and attorney-client privilege pursuant to (b)(5). ICE withheld all domain names and many names in email exchanges pertaining to the agency's publication of the detainee death report on its website, rendering it impossible to determine whether the privilege actually applies, or whether the communication was interagency. *See* Melchert Decl. at 46 and Ex. Q (redacting both sender and multiple recipients and almost the entire body of the email under attorney client privilege). The "Attorney/Client Privilege" disclaimer at the bottom of the email appears crossed out, yet ICE alleges this privilege. *See* Pineiro Decl. at p. 85-86; Melchert Decl. at 46 and Ex. Q at bates stamped 1308. Without email domain names of the sender and recipients, Plaintiffs are unable to verify that no third parties were included on this communication. ICE makes similar blanket redactions of domain names on hundreds of pages of emails that appear from their context to include segregable material. *See* Melchert Decl. Ex. P.

ICE also withheld draft versions of Roxsana's mortality review *in their entirety*, despite producing the final draft which evidences with certainty that segregable factual information exists. *Compare* Melchert Decl. at Ex. R (fully redacted mortality review) *with* Ex. S (partially redacted final mortality review). In the final mortality review, ICE only redacted the names of agency personnel, but the content of the report itself contains only one redaction: the name of an employee in four pages of single-spaced type. *Id.* at Ex. S. The report provides a timeline of the medical treatment Roxsana received in custody along with related findings about her care and recommendations. *Id.* at Ex. S. Given the high level of non-exempt factual data and minimal redactions, it is plainly inconceivable that the draft versions of the report are appropriately withheld in their entirety. *See* Melchert Decl. ¶¶ 48-50. Defendants have thus failed to disclose reasonably segregable portions of the records, and Plaintiff are entitled to summary judgment on this issue.

### 3.      Defendants Failed to Adequately Justify Non-Responsive Designations

Defendants' failure to adequately justify non-responsive designations is clearly evidenced from the face of Defendants' declarations. Despite repeated requests for an explanation of how Defendants tasked their response to Plaintiffs' FOIA requests and how Defendants determined which documents were duplicative, to date, Plaintiffs have received no sworn statement about either. *See* Melchert Decl. ¶22. Defendants' declarations only describe the general process the agency uses to respond to FOIA, whereby the Pineiro Declaration summarily concludes that all such designations were correct. *See* Pineiro Decl. at ¶74. CRCL does not provide any sworn statement that its redactions were correctly applied at all. *See generally*, ECF No. 38 at Attachment #2. "Conclusory and generalized" explanations for withholding non-relevant documents should be rejected by this Court. *Gahagan v. U.S. Citizenship & Immigration Servs.*, No. CIV.A. 15-796, 2015 WL 6738549, at *4 (E.D. La. Nov. 4, 2015) (finding *Vaughn* index lacked specificity needed to allow Court to make a "reasoned judgment as to whether withheld material is actually exempt under FOIA" where *Vaughn* index invoked documents withheld on relevancy grounds using only "conclusory and generalized terms").

### 4.     Defendants' Wholesale Redaction of Names Under Exemptions 6 and 7(C) is Unlawful

When Exemptions 6 and 7(C) are asserted, the Court invokes a two-step test to balance whether a specific individual's right to privacy outweighs the public interest in release. *See Cameranesi v. U.S. Dept. of Def.*, 856 F.3d 626, 637 (9th Cir. 2017); *Ecological Rights Found.*, 2017 WL 5972702 at *8 (the Court must determine whether the privacy interest "outweigh[s] the public's interest in the disclosure of information that 'would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.'") (internal citation omitted).  First, the Court "evaluate[s] the personal privacy interest at stake to ensure 'that disclosure implicates a personal privacy interest that is nontrivial . . . or more than [ ] de minimus.'" *Id.* (quoting *Yonemoto*, 686 F.3d at 693).  Second, "if the agency succeeds in showing that the privacy interest at stake is non-trivial, the requester 'must show that the public interest sought to be advanced is a significant one that the information [sought] is likely to advance that interest. *Id.* (quoting *Lane v. Dept. of Interior*, 523 F.3d 1128, 1137 (9th Cir. 2008)) (alterations in original).

Defendants' *Vaughn* Indices fail to conduct this individualized analysis, instead electing for a wholesale redaction strategy that applies a near-uniform presumption of secrecy.  Defendants' failed to meaningfully weigh the public interest in releasing names of senior-level agency employees who are publicly-known and thus not entitled to the same privacy protections that are protected by Exemptions 6 and 7(C). For example, Plaintiffs know of correspondence between Andrew R. Lorenzen-Strait, ICE Deputy Assistant Director, and Diane Witt, El Paso's Field Office Director, to arrange for disposition of Roxsana's property after her death. *See* Melchert Decl. ¶53, Ex. X. Both Mr. Lorenzen-Strait and Ms. Witte are high-ranking officials, yet no records produced by Defendants contain either of their names.

Other redactions by Defendants under this exemption are plainly nonsensical. For example, ICE claimed Exemptions (b)(6) and (b)(7)(c) to presumably redact the word "woman" or "individual." *See* Melchert Decl. at Ex. W ("Please find attached a letter from [(b)(6)/(b)(7)(c)] of the Human Rights Campaign (HRC), writing to express HRC's deep concern regarding the recent death of Roxsana Hernandez, a transgender [(b)(6)/(b)(7)(c)] who died while in ICE custody."). Defendants' *Vaughn* Index supports this redaction by discussing the privacy interest of ICE

1   employees.  *See* Pineiro Decl. at Ex. I, pp. 99-100.  However, it is inconceivable that the second

2   word redacted is an ICE employee's name.

3   **5.     Defendants Unlawfully Invoked Exemption 5 to Shield Key
           Documents Related to Roxsana's Death**

4       The DPP "shields from public disclosure confidential inter-agency memorandum *on*

5   *matters of law or policy*."  *Nat'l Wildlife Fed'n v. U.S. Forest Serv.,* 861 F.2d 1114, 1116 (9th Cir.

6   1988) (emphasis added); *see* 5 U.S.C. § 552(b)(5). FOIA's protection for deliberative materials

7   exists to encourage frank, open discussions *on matters of policy* between subordinates and

8   superiors, protects against premature disclosure of proposed policies, and protect against public

9   confusion. *See id.* at 1117 (internal citations omitted); *Ctr. for Biological Diversity*, 2008 WL

10  5129417 at *5 (the deliberative process privilege "covers documents reflecting advisory opinions,

11  recommendations, and deliberations comprising part of a process by which decisions and policies

12  *are formulated*.") (quoting *Dept. of the Interior v. Klamath Water Users Protective Ass'n*, 532

13  U.S. 1, 8 (2001) (emphasis added).  Final opinions and factual material not intertwined with legal

14  or policy matters are not shielded by the DPP.  *See NLRB*, 421 U.S. at 153–54 ("We should be

15  reluctant, therefore, to construe Exemption 5 to apply to . . . 'final opinions,' which not only

16  invariably explain agency action already taken or an agency decision already made, but also

17  constitute 'final dispositions' of matters by an agency.") (internal citations omitted); *Ctr. for*

18  *Biological Diversity*, 2008 WL 5129417 at *6 ("The privilege also does not protect 'material that

19  is purely factual, unless the material is so inextricably intertwined with the deliberative sections of

20  documents that its disclosure would inevitably reveal the government's deliberations.'") (quoting

21  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)). This also harmonizes with FOIA's

22  segregability requirement which requires "[a]ny reasonably segregable portion of a record" to be

23  provided "after deletion of the portions which are exempt." 5 U.S.C. § 552(b).

24      To properly invoke the DPP, Defendants must demonstrate that each document invoking

25  this privileged is "*both* (1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2)

26  'deliberative,' meaning 'it must actually be related to the process by which policies are

27  formulated." *Nat'l Wildlife Fed'n*, 861 F.2d at 1117 (emphasis in original) (quoting *Jordan v. U.S.*

28  *Dept. of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978)).  "These twin requirements recognize that

18

the underlying purpose of this privilege is to 'protect[] the consultative functions of government by maintaining the confidentiality of advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* Importantly, Defendants bear the burden to set forth and justify the application of the privilege "on a document by document basis." *Ctr. for Biological Diversity*, 2008 WL 5129417 at *6.

Defendants invoked the DPP in an effort to unlawfully withhold draft versions of Roxsana's Detainee Death Review and Mortality Review, key documents regarding the analysis of Roxsana's death while in ICE custody, simply because these documents are in non-final form. *See* Defendants' Brief at 15; *see, e.g.*, Pinero Decl. at Ex. A, p. 19 (withholding the entire draft of Roxsana's Preliminary Mortality Review Report based on Exemption b(5) solely because of its draft without any explanation of its predecisional and deliberative nature). However, both documents have already been produced by Defendants in their final form. *See* Melchert Decl. Ex. S & U. This fact alone negates any "pre-decisional" value either document may have. *See Ecological Rights Found.*, 2017 WL 5972702 at *4 (finding withheld documents that post-date a decision already made "cannot be considered to be party of the deliberative process in advance of a particular decision"). In fact, Roxsana's detainee death review is required to be published on ICE's website and is therefore, by nature and purpose, a public document.[4]

ICE also cannot establish that either document is "actually […] related to the process by which policies are formulated." *Nat'l Wildlife Fed'n*, 861 F.2d at 1117 (quoting *Jordan v. U.S. Dept. of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978)). ICE has made no representation that either the detainee death review or the mortality review are used to create agency policy, and, therefore, cannot sustain its burden to establish that its redactions of these entire drafts were proper. Indeed, even ICE's Vaughn Index supports this deduction. For example, a four-page preliminary draft of

---

[4] Congressional requirements described in the Department of Homeland Security Appropriations Bill (2018) require ICE to make public all reports regarding an in-custody death within 90 days. ICE, shirking this requirement, posted a sham detainee death *report* for Roxsana on its website on December 11, 2018 after mounting public pressure. *See* Melchert Decl. ¶ 49. However, after receiving documents from ICE in the instant case, Plaintiffs learned that the operative detainee death review completed with details was never made public as required by law. *See* Melchert Decl. Ex. U. ICE cannot claim that this report, which is legally required to be posted on its website by Congress for the purpose of oversight, is exempt from pubic inspection, especially after it produced the final versions with minimal redactions.

the mortality review that was entirely redacted has the following *Vaughn* Index entry: "[t]his Preliminary report was drafted by the OPR investigator who conducted investigation into the death of a detainee. This report contains information pertaining to medical care, interviews of detention facility personnel." Pineiro Decl. at Ex. A, p. 20. This explanation in no way supports the creation or revision of agency policy. Rather, the care Roxsana received and ICE's investigation into her death are matters of public concern, as demonstrated by the public outcry about her death and demands for accountability from the agency by lawmakers. *See* Egyes Decl. at ¶¶10-11, 15-16, & 20; Melchert Decl. at Ex. G, J.  The DPP is intended to permit the agency to engage in policymaking not to shield its actions, including wrongdoing, from public view. Defendants' withholding of the entire drafts of the detainee death review and mortality review is thus unlawful. Defendant CRCL is, likewise, not using the redacted information to create agency policy and therefore cannot shield this information pursuant to exemption (b)(5). Such withholdings also simultaneously violate the FOIA's reasonably segragability requirement. *See* 5 U.S.C. § 552(b).

ICE also invoked the DPP to shield draft press statements. However, as recently decided by the District Court of the Northern District of Illinois, the ICE FOIA office cannot illegally withhold messaging communications about potential media statements about agency policies that have already been decided.  *Stevens v. Dep't of Homeland Security*, 2020 WL 1701882, at *6 (N.D. Ill. Apr. 4, 2020). Defendants here fail to demonstrate how key draft press statements are predecisional when the policies they concern are already finalized and publicly disseminated. *See e.g.*, Pineiro Decl. at Ex. A, at p. 102-104 (partially redacting proposed public statements regarding "[p]roposed media tour of Cibola transgender pod" pursuant to Exemption b(5), including "edits and recommendations on a proposed public statement from ICE" with no specific explanation of how the information is predecisional or deliberative).

### 6.   Defendants' Serial Misapplication of Exemption 7(E) Entitles Plaintiffs to Summary Judgment

Defendants also inappropriately withheld database information based on purported "national security concerns" pursuant to Exemption 7(E) of the FOIA.  ICE's withholding of database information, event ID numbers, and other reasonably segregable, non-exempt information based on Exemption 7(E) is improper.  Exemption 7(E) "protects records from

20

disclosure if those records 'would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *Anguiano v. United States Immigration & Customs Enf't*, 356 F. Supp. 3d 917, 923 (N.D. Cal. 2018) (quoting 5 U.S.C. § 552(b)(7)(E)).  "The statutory requirement that the government show that disclosure 'could reasonably be expected to risk circumvention of the law' applies only to guidelines for law enforcement investigations or prosecutions, not to techniques and procedures." *Amer. Civil Liberties Union of N. Cal. v. U.S. Dept. of Justice*, 880 F.3d 473, 491 (9th Cir. 2018) (quoting *Hamdan,* 797 F.3d at 778. Investigative techniques are only exempt where they are "not generally known to the public." *Rosenfeld v. U.S. Dept. of Justice*, 57 F.3d 803, 815 (9th Cir. 1995).  "As used in Exemption 7(E), 'guidelines' refer to how the agency prioritizes its investigative resources, while 'techniques and procedures' cover 'how law enforcement officials go about investigating a crime.'" *Anguiano,* 356 F. Supp. 3d at, 924 (internal quotations and citations omitted).

Here, ICE inappropriately invokes this exemption. In Roxsana's Form I-213 Record of Deportable/Inadmissible Alien, completed when Roxsana entered the U.S., ICE withheld the contents of one box entitled "threat posted to the United States" claiming a (b)(7)(E) redaction and include the following remarks: "likely to add to illegal population." *See* Melchert Decl. at Ex. Y. The anti-immigrant characterization of Roxsana, a transgender asylum seeker fleeing rape and attempted murder expressed in the remark immediately following this redaction suggest impermissible animus by agency employees and false national security concerns. In another instance, ICE's Vaughn index alleges a law enforcement URL was redacted pursuant to (b)(7)(e). *See* Pineiro Decl. at Ex. A, p. 29. Upon inspection, the redaction is an entire paragraph of an email sent from the Office of Professional Responsibility to the field office days after Roxsana's death regarding its investigation. *See* Melchert Decl. at Ex. Z.  While it is possible that a URL is as long as an entire paragraph, it is unlikely. Also, similar to other improperly invoked exemptions, Defendants' *Vaughn* Index fails to explain with specificity why information withheld pursuant to Exemption 7(E) is properly redacted and "creates a risk of circumvention of the law."  *See Anguiano,* 356 F. Supp. 3d at 924 ("without even the name of the technique or any context for why

this technique . . . is not commonly known, the Court lacked sufficient information to consider whether ICE properly redacted this information under Exemption 7(E)").

Moreover, Plaintiffs asked Defendants at their first meet and confer, held August 19, 2019, whether any investigations by any government agencies remained open and ongoing relating to the death of Roxsana.  *See* Melchert Decl. at 55.  Pursuant to those conversations and upon information and belief of Plaintiffs, there are no open investigations relating to this matter.  Absent an open investigation relating to this matter, Defendants are not permitted to invoke Exemption 7(E) to shield documents.

## VI.    CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Court should GRANT Plaintiffs' Cross-Motion for Summary Judgment in its entirety, DENY Defendants' Motion for Summary Judgment in its entirety, ENJOIN Defendants improper withholdings in violation of the Freedom of Information Act, DECLARE that Defendants violated the mandatory timing requirements of the FOIA, and grant such other and further relief as the Court deems appropriate.

Date: September 21, 2020                  Respectfully submitted,

 _/S/ R. Andrew Free_
R. Andrew. Free
(TN Bar No. 30513)
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
Phone: (844) 321-3221
Fax: (615) 829-8959
Andrew@ImmigrantCivilRights.com
* Admitted Pro Hac Vice

Shawn Thomas Meerkamper
(CA Bar No. 296964)
Transgender Law Center
P.O. Box 70976
Oakland, CA, 94612
Phone: (510) 587-9696, ext. 303
Fax: (510) 587-9699
shawn@transgenderlawcenter.org

Kimberly A. Evans
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
Phone: (302) 622-7086

Fax: (302) 622-7100
kevans@gelaw.com
*Pro Hac Vice Admission Forthcoming*

*Counsel for the Plaintiffs*