**SHAWN THOMAS MEERKAMPER** (CA Bar No. 296964)
Transgender Law Center
P.O. Box 70976
Oakland, CA, 94612
Phone: (510) 587-9696, ext. 303
Fax: (510) 587-9699
shawn@transgenderlawcenter.org

**R. ANDREW FREE*** (TN Bar No. 30513)
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
Phone: (844) 321-3221
Fax: (615) 829-8959
Andrew@ImmigrantCivilRights.com
*Admitted Pro hac vice*

**KIMBERLY A. EVANS** (DE Bar No. 5888)
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
Phone: (302) 622-7086
Fax: (302) 622-7100
kevans@gelaw.com
*Pro Hac Vice Admission Forthcoming*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TRANSGENDER LAW CENTER, and JOLENE K. YOUNGERS, as personal administrator for the wrongful death estate of Roxsana Hernandez,<br><br>    *Plaintiffs,*<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY;  OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES – UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>    *Defendants.* | Civil Action No.: 3:19-cv-03032-SK<br><br>**DECLARATION OF LYNLY S. EGYES** |

1

Civil Action No.: 3:19-cv-03032-SK      Declaration of Lynly Egyes in Suport of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

I, Lynly Serena Egyes, being duly sworn state the following is true and accurate to the best of my knowledge:

1.      I am the Legal Director at the Transgender Law Center ("TLC"). Transgender Law Center (TLC) is the largest national trans-led organization advocating for a world in which all people are free to define themselves and their futures. Grounded in legal expertise and committed to racial justice, TLC employs a variety of community-driven strategies to keep transgender and gender nonconforming people alive, thriving, and fighting for liberation.

2.      Prior to joining TLC approximately three years ago, I was the legal director at the Urban Justice Center (UJC), where I worked for almost eight years.  At UJC I developed an expertise in many areas including immigration law, conditions of immigration confinement and in working with foreign-born survivors of human trafficking with a specific focus on LGBT survivors. While at UJC, I provided over 150 trainings on topics mainly focused on immigration, detention conditions, and human trafficking victimization.  I was regularly called by Homeland Security Investigations and Federal Bureau of Investigations to provide screening and representation for foreign-born survivors of human trafficking.

3.      For the past six years, I have also represented many families in immigration detention and supported advocacy to improve conditions in detention centers.  I have represented families at detention center in Artesia, New Mexico, Dilly, Texas and Berks, Pennsylvania.

4.      In my role I manage all aspects of the organization's legal work. Due to my expertise on immigration and human trafficking, I support much of TLC's immigration work.  I am also regularly called on by outside agencies to support cases, provide technical assistance and guidance and train attorneys and legal workers on immigration issues and cases through individual support and larger trainings and presentations.

5.      My statements made herein are based upon my personal knowledge of the instant case as a representative of Plaintiff TLC in the instant action, and as one of the attorneys retained to litigate the wrongful death suit of Roxsana Hernandez (yet to be filed), and *Youngers v. MTC et al.*, 1:20-cv-00465 (D.N.M. 2020), a tort action against all private contractors who transported Roxsana prior to her death. In my role as Legal Director of TLC I assisted to draft the complaint

2

Civil Action No.: 3:19-cv-03032-SK                    Declaration of Lynly Egyes in Suport of Plaintiffs' Cross-Motion for
                                                     Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

in the instant action and am familiar with all aspects of this case. My knowledge is also predicated upon conversations with my colleagues and documents within TLC's possession.

6.      I know from over a decade of experience working with transgender people that many seek asylum and other immigration relief in the US because they face brutal violence in their in their home countries for being transgender. I also know that transgender people face horrific treatment in immigration jails, including disproportionately high rates of physical and sexual assault by immigration officers and other people detained, as well as harassment because they are transgender.

7.      In fulfillment of its mission, TLC has created several projects to support transgender migrants to navigate the country's immigration systems and to prevent any further deaths or trauma within our communities as a result of immigration systems.

8.       One such fiscally sponsored project, the Black LGBTQIA+ Migrant Project[1] ("BLMP"), focuses solely on advocacy and support by and for Black LGBTQIA+ migrants. With a staff of five, BLMP is a membership-based organization that engages in national and local organizing to resist immigration enforcement, detention and deportations through work within criminal justice/immigrant rights movements, and represents community members in deportation defense.

9.      Throughout my career, I have represented hundreds of clients in immigration proceedings, many of whom are detained in detention centers.  I am often called in by other attorneys or law enforcement to screen for human trafficking or to identify other immigration options that may have been overlooked.  Many of my cases at TLC have made national attention. Christina Lopez Navarro was in detention for almost five years with an order of deportation and an appeal denied by the Board of Immigration Appeals (BIA).  Although it was a long process, through my advocacy, Ms. Lopez Navarro was eventually identified as a trafficking victim, fully cooperated with law enforcement, was released from immigration detention, and currently has T nonimmigrant status.  I also represented Chin Tsui, who was held in solitary confinement in

---

[1] BLACK LGBTQIA+ MIGRANT PROJECT, https://transgenderlawcenter.org/programs/blmp (last visited Sept. 17, 2020).

immigration detention for almost two years solely because he is transgender. Due to societal biases, he was also never screened for trafficking victimization despite the multiple red flags he exhibited. We won Chin's case, and he is now out of immigration detention.

10.     In the wake of Roxsana's death and the urgent dangers transgender people face in detention, TLC began a coalition to release transgender people from detention and advocate for safer conditions, along with two BLMP and another organization, Familia. This coalition led the Justice for Roxsana campaign demanding that the Office of Inspector General of Department of Homeland Security ("OIG") and CRCL conduct meaningful investigations into her death, that it release the congressionally-mandated detainee death review within 90 days of her death, and to enforce the Department of Homeland Security's ("DHS") policies to prevent further deaths in custody. This campaign mobilized over 100 people to Albuquerque, New Mexico to engage in organizing, education, and in a direct action in August of 2018.

11.     Roxsana's death sparked significant public outcry. After TLC announced that we were suing and released the preliminary independent autopsy report that Roxsana's family had requested in November of 2018, we received numerous requests for interviews by reporters. Our advocacy appeared to pressure Immigration and Customs Enforcement ("ICE") to take some action because in December of 2018, the agency promptly posted on their website the detainee death report of Roxsana—well after the 90-day deadline—and those of several other people who had died in custody shortly thereafter. Emails revealed through the instant case confirmed that ICE created a landing platform and posted several detainee death reports during the two weeks that followed our press release and the ensuing media frenzy.

12.     Receiving relatively current documents about the executive agencies charged with operating this country's immigration systems is critically important to our advocacy efforts. For example, in May of 2019, TLC along with BLMP led a congressional briefing on the experiences of LGBT migrants of color in immigration jails. During the briefing, TLC staff testified about our work and formerly-detained LGBT people testified about the abysmal conditions they faced while in custody, including lack of adequate medical care. Despite having made a FOIA request to defendants ICE and CRCL in January and February of 2019, we had yet to receive a single

4

document pursuant to our request by the time of the briefing. Had ICE and CRCL complied with FOIA and timely produced responsive nonexempt documents, we would have included information from their productions in the briefing, such as how ICE detained and transported Roxsana without medical clearance to do so, how CBP and ICE failed to provide her with any meaningful medical care, including anti-retroviral medication, in violation of its own policies, and how video surveillance footage of Roxsana disappeared despite receipt of letters requiring its preservation. However, because of defendants' extensive and repeated delays complying with the FOIA and responding to our requests, we missed this opportunity.

13.     That was not the only instance that defendants' delays directly thwarted TLC's advocacy efforts. In September of 2019, TLC drafted a complaint to defendants as well as to DHS and its Department's Office of Inspector General, and along with over sixty other organizations that advocate for humane conditions in immigration detention, about the inadequate medical treatment that LGBTQ migrants receive in ICE jails. The complaint discussed Roxsana's case along with several other cases of custodial deaths and medical neglect. Despite suing defendants in the instant case in May of 2019 to comply with the FOIA and produce the requested documents, TLC had yet to receive a single document from defendants when we submitted our complaint in September.

14.     After we received our first production from defendants in the instant case on October 2, 2019, we discovered that video surveillance footage from Cibola detention facility had not been preserved despite letters sent requiring its preservation. We also discovered that the detainee death report that ICE had published in December of 2018 was not in fact the operative detainee death review the agency used and only a truncated report which omitted the most critical facts about what happened to Roxsana while in the agency's custody. The bulk of the public report included irrelevant facts about Roxsana's prior criminal and immigration history, while the operative detainee death review produced in the instant litigation contained detailed facts about her transport and detention that was never released to the public as mandated by Congress.

15.     We brought these facts to the press, which prompted Senators Harris and Blumenthal to draft a letter to Attorney General Barr demanding that a special counsel be

1  appointed to investigate Roxsana's death.[2] *See* Letter from Senators to Barr dated October 31,

2  2019, annexed hereto as **Exhibit A**.

3       16.    In December of 2019, we submitted a supplemental complaint to DHS and its sub-

4  agencies because we had received significantly more information through ICE's productions in

5  the instant case about what happened to Roxsana. Had defendants complied with the FOIA and

6  timely responded to our requests we would not have needed to file a supplemental complaint three

7  months after our original complaint to include this new information. Furthermore, these important

8  facts about the agency's questionable actions surrounding Roxsana's death would have been

9  available to Senators Harris and Blumenthal to include in their letter. Because executive agencies

10  are subject to prompt and drastic change through executive action—as exemplified by the last four

11  years, and, as opportunities for advocacy must be seized quickly due to the fast-paced nature of

12  hill advocacy, access to current government information is hugely important for its usefulness. In

13  this way, defendants' delays in the instant action directly hindered TLC's advocacy efforts.

14       17.    During 2019 it became clear that transgender migrants needed more support at the

15  US-Mexico border as policies and practices of DHS became increasingly hostile to them. In

16  response, we launched a pilot Border Project where a TLC attorney based along the Tijuana and

17  San Diego border assists LGBTQ migrants to find sponsors in the US, prepare people for what

18  they should expect to experience once entering the US and in detention and helps prepare them for

19  their asylum applications.  If defendants had complied with the FOIA and timely responded to our

20  request, we would be able to better prepare LGBT migrants for entry and detention in the US.

21       18.    When the COVID-19 pandemic swept the globe, TLC filed a class action lawsuit

22  to release all transgender migrants in immigration detention due to the population's particular

23  vulnerability to COVID-19 because of their inability to social distance and because LGBT people

24  in ICE custody are 97 times more likely to be sexually victimized than non-LGBT people in

25  detention. Further, as documented extensively, LGBT people's access to health care is dismal in

26

27  [2] Letter from Senators Kamala D. Harris and Richard Blumenthal, to Attorney General William Barr, (Oct. 31, 2019), (available online at

28  https://www.harris.senate.gov/imo/media/doc/Letter%20to%20DOJ%20re%20Special%20Counsel%20for%20Evidence%20Destruction%20FINAL.pdf).

6

Civil Action No.: 3:19-cv-03032-SK          Declaration of Lynly Egyes in Suport of Plaintiffs' Cross-Motion for
Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

1    detention and therefore our class members would receive subpar medical treatment if they contract

2    COVID-19.   Had defendants complied with the FOIA, timely responded to our request, and

3    properly disclosed all non-exempt materials, we likely would have been able to utilize the evidence

4    in the litigation.

5    　　　　19.　　As stated *supra* at ¶2, another aspect of my work is working with LGBT survivors

6    of human trafficking.  For over a decade, I have represented survivors of trafficking with a specific

7    focus on LGBT victims.  In the past, I have trained the FBI on working with LGBT victims of

8    trafficking.  I have also trained United States Attorney's Office in the Southern District, Newark

9    Asylum office, and other government agencies on issues connected to LGBT survivors of

10   trafficking.  I have also partnered on trainings with both the Department of Justice and Homeland

11   Security Investigations training law enforcement, prosecutors, and community groups that focus

12   on working with victims of human trafficking.  One important aspect of this work is identifying

13   victims' previous experiences with law enforcement, medical professionals and incarceration.  A

14   better understanding of these experiences provides critical guidance on how to approach and screen

15   possible victims.   Ms. Hernandez reported trafficking victimization and the documents that

16   defendants have withheld could have been used as training guides and case examples in writings

17   and presentations to help identify other victims.  These documents could have provided a roadmap

18   of what Ms. Hernandez experienced in the US and to educate law enforcement and prosecutors

19   about the experiences of victims to help identify others.

20   　　　　20.　　For all of these efforts to support transgender migrants at TLC we rely on receiving

21   current information about DHS and its sub-agencies. Through the instant case, we received many

22   relevant documents useful to these projects, such as policies that are not published on ICE's

23   website, reports, and complaints. For example, through this case we received a complaint against

24   Cibola detention center that was instrumental to coalition efforts we participated in that resulted

25   in the closure of its transgender housing unit.  Similarly, documents we received in the instant case

26   were instrumental for drafting the aforementioned supplemental complaint we submitted to DHS

27   in December of 2019.

28   　　　　21.　　Receiving documents which are two years out of date interferes with our advocacy

efforts for accountability and transparency from the US immigration systems. Defendants' repeated delays producing documents that are highly relevant to so much of TLC's work on such pressing issues of public concern directly harms this work and will continue to do so as long as they continue to violate the FOIA. Receiving stale documents is not government transparency but a history lesson, and our primary goal is to prevent further deaths and injury at the hands of these agencies.

22.     The agencies' violation of the FOIA thwarts TLC's ability to inform the communities we serve with critical information they need to survive and build safety; it shrouds their actions from the public view until years after significant events transpire and the opportunity to intervene has come and gone. As we approach the presidential election, it is imperative that the public is aware of how the executive branch runs these agencies to make informed decisions in November.

23.     As demonstrated already, any further delays from defendants will continue to harm TLC's work to support LGBTQ migrants and frustrates our mission.

## **VERIFICATION**

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing declaration is true and correct to the best of my knowledge and belief.

Date: September 21, 2020                                    Respectfully submitted,

/s/ Lynly S. Egyes