**SHAWN THOMAS MEERKAMPER** (CA Bar No. 296964)
Transgender Law Center
P.O. Box 70976
Oakland, CA, 94612
Phone: (510) 587-9696, ext. 303
Fax: (510) 587-9699
shawn@transgenderlawcenter.org

**R. ANDREW FREE*** (TN Bar No. 30513)
Law Office of R. Andrew Free
P.O. Box 90568
Nashville, TN 37209
Phone: (844) 321-3221
Fax: (615) 829-8959
Andrew@ImmigrantCivilRights.com
* *Admitted Pro hac vice*

**KIMBERLY A. EVANS** (DE Bar No. 5888)
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, DE 19801
Phone: (302) 622-7086
Fax: (302) 622-7100
kevans@gelaw.com
**Pro Hac Vice Admission Forthcoming*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TRANSGENDER LAW CENTER, and JOLENE K. YOUNGERS, as personal administrator for the wrongful death estate of Roxsana Hernandez, <br><br>   *Plaintiffs,* <br><br> v. <br><br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES – UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br><br>   *Defendants.* | Civil Action No.: 3:19-cv-03032-SK <br><br> **DECLARATION OF DALE MELCHERT IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

1

I, Dale Melchert, being duly sworn, state the following is true and accurate to the best of my knowledge:

1.      I am a staff attorney at the Transgender Law Center ("TLC"), a non-profit organization dedicated to advancing the rights and wellbeing of transgender and gender non-binary people across the United States. In my role, I participate in strategic litigation and engage in policy and other forms of advocacy to that end.

2.      My knowledge for all the assertions in this affidavit is based upon my personal knowledge of the instant case. I have been personally involved from the time I made the underlying FOIA requests on behalf of plaintiffs that form the basis of this action, and through each step of litigation since. My knowledge is also based upon review of documents within the possession of TLC, including all the documents produced by Defendants, as well as conversations with my colleagues through my professional role, including legal representation of the family of Roxsana Hernandez. In that role, I am one of the attorneys of record for plaintiffs in *Youngers v. Management Training Company et al*, 1:20-cv-00465 (D.N.M. 2020), a tort action filed against the private contractors of ICE who had custody of Roxsana Hernandez prior to her death, and an FTCA complaint TLC will file against the United States within the next eight months.

3.      Transgender Law Center's work addresses many spheres of life that impact our communities, including but not limited to healthcare, immigration, identity documents, criminalization, employment, and more. We work closely with grassroots community organizations across the country to support local transgender leadership and build strong networks amongst our communities. We generally keep abreast of any major issues affecting transgender people across the country.

4.      In the spring of 2018, we began monitoring the caravan of transgender migrants who travelled through Central America and Mexico to seek asylum in the United States. TLC staff members were sent to the United States/Mexico border to support the caravan.

5.      After one caravan member, Roxsana Hernandez, a transgender asylum seeker from Honduras, died in ICE custody, our legal department began investigating the circumstances

surrounding her death. Shortly thereafter, TLC was retained by Roxsana's family to investigate and litigate claims against those responsible for her demise.

6.     On January 29, 2019, I submitted a FOIA request on behalf of Plaintiffs to Defendant ICE for, *inter alia*, any and all documents within its possession pertaining to Roxsana, including several search terms. A true and correct copy of TLC FOIA Request to ICE dated January 29, 2019, is attached as **Exhibit A**.

7.     On February 5, 2019, I submitted a FOIA request on behalf of Plaintiffs to Defendant DHS Office of Civil Rights and Civil Liberties for, *inter alia,* any and all investigations into the circumstances surrounding the death of Roxsana. A true and correct copy of TLC's FOIA Request to CRCL dated February 5, 2019, is attached as **Exhibit B**.

8.     To date, Plaintiffs have received no acknowledgment from Defendant ICE to their request, and this fact remains uncontroverted. The declaration of Fernando Pineiro admits that the agency did not find my request until Plaintiffs filed suit to compel the agency to comply with it months later. *See* ECF No. #38, at ¶ 6.

9.     On April 19, 2019, I received an acknowledgment letter from CRCL, almost three months after I submitted my request, assigning the request tracking number 2019-HQFO-00384. A true and correct copy of DHS's Acknowledgement dated April 19, 2019 is attached as **Exhibit C**.

10.     Having received no records pursuant to either request, on May 31, 2019, Plaintiffs initiated the instant action by filing a complaint with this Court, pursuant to 5 U.S.C. § 552 *et. seq.*

11.     On August 19, 2019, counsel for the parties met and conferred as ordered by the Court. During the meet and confer, in which I personally participated, counsel for Defendants, Giaconda Molinari, ("Ms. Molinari") represented to counsel for Plaintiffs that:  1) Defendant ICE had identified approximately 3,100 records that were responsive to Plaintiffs' request and partially subject to release, and Defendant CRCL identified approximately 631 pages; and 2) Defendants expected to release 500 documents a month beginning at the end of September 2019. Counsel for Plaintiffs, R. Andrew Free ("Mr. Free") responded that Plaintiffs believe Defendants are capable of releasing more than 500 pages per month based upon knowledge of other FOIA litigation where

3

Civil Action No.: 3:19-cv-03032-SK                    Declaration of Dale Melchert in Suport of Plaintiffs' Cross-Motion for
                                                      Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

ICE or Department of Homeland Security was a defendant and produced significantly more than 500 pages per month.

12.     During the meet and confer, Mr. Free inquired about the components and subcomponents Defendants tasked with searches in order to avoid an adequacy of the search issue after the records had been produced. Ms. Molinari represented that they did not know. Plaintiffs' counsel provided counsel for defendants with the components likely to contain subject records based on what we know about Roxsana's journey including:

> Enforcement and Removal Operations - Field Operations
> ERO San Diego Field Office
> ERO El Paso Field Office
> Immigrant Health Services Corps
> Custody Management
> External Reviews and Audits Unit
> Office of Principal Legal Advisor - Office of Chief Counsel
> Office of the Executive Assistant Director (HQ)
> Office of the Director/Acting Director (HQ)
> Office of Professional Responsibility
> Office of Public Affairs
> Office of Legislative Affairs
> Office of the Director

13.     Also during this meet and confer, Mr. Free inquired to Ms. Molinari about whether there were any active investigations into Roxsana's death that would merit withholdings pursuant to exemption (7)(E) because we had not heard of any such investigation nor had the agency represented as much. Later, documents produced by the Department of Homeland Security's Office of Inspector General ("OIG") on October 22, 2019, which we received through a separate FOIA request, showed that there was no open investigation by OIG.

14.     In the parties' joint case management statement dated September 3, 2019, counsel for defendants represented to the Court that "Defendants anticipate releasing 500 pages monthly beginning at the end of September, until production has been completed. Thus, ICE anticipates that its release will be completed six months later, in February 2019. Defendants can process 500 pages monthly due to limited government resources, and can provide a declaration explaining those resources, if requested." *See* ECF No. # 15, at 2.

15.     On September 9, 2019, counsel for the parties again spoke after the Case Management Conference and reiterated these differing positions regarding the number of pages of

4

records to be disclosed. Mr. Free, again, inquired of counsel for defendants about which components had been searched and again provided the above list of the various components expected to maintain such records. I was present for this conversation.

16.     During this conversation, counsel for Plaintiffs also told counsel for defendants that Plaintiffs sought three critical documents typically created and produced by ICE after detainee deaths pertaining to Roxsana, including: 1) the detainee death review, a document mandated to be published by Congress within 90 days of an in-custody death for oversight; 2) the mortality or morbidity review; and 3) the root cause analysis ("RCA").

17.     On September 10, 2019, counsel for Plaintiffs emailed counsel for Defendants, Jevechius Bernardoni ("Mr. Bernardoni"), with the list of components again. A true and correct copy of Mr. Free's Email dated September 10, 2019 is attached as **Exhibit D.**

18.     On September 25, 2019, Mr. Bernardoni sent a letter to counsel for Plaintiffs stating defendants would agree to release 750 pages a month if Plaintiffs would agree to forego a motion for summary judgment. Furthermore, the letter stated: "ICE can confirm that it has and/or will search for potentially responsive records from each of the custodians listed in your September 10, 2019 email." A true and correct copy of Mr. Bernardoni's Letter dated September 25, 2019 is attached as **Exhibit E**.

19.     On September 27, 2019, we responded to this letter stating that this offer to produce 750 pages per month contradicted defendants' former position that the agencies are unable to produce more than 500 pages a month. The letter also counter offered production of 1,000 pages per month beginning at the end of September 2019 in lieu of a motion for summary judgment in order to expeditiously resolve the matter. A true and correct copy of Plaintiff's Letter dated September 27, 2019 is attached as **Exhibit F**. This letter also again inquired as to which components of the agency had already been tasked because we still had not received a substantive response. Counsel for Defendants represented that ICE did not agree with our position that ICE could produce more than 500 pages of records per month.

20.     On September 30, 2019, Defendant CRCL produced 12 pages of records of the 631 pages identified by the agency. Five and a half months later, on March 12, 2020, DHS produced

Declaration of Dale Melchert in Suport of Plaintiffs' Cross-Motion for
Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

1  an additional 20 pages in a "supplemental response." On July 27, 2020, we received another

2  "supplemental response" of 114 pages—a year and a half after my initial request. This was the

3  first records I received responsive to my request.

4      21.    On October 2, 2019, Plaintiffs received 337 pages from ICE—the first records

5  produced by the agency since Plaintiff's FOIA request eight months prior. This was the first

6  records I received responsive to my request.

7      22.    Contrary to its assertion that it would produce 500 pages per month to Plaintiffs,

8  Defendant ICE, began *reviewing* 500 pages per month releasing any documents the agency

9  deemed non-exempt and non-duplicative, resulting in monthly productions to Plaintiffs that were

10  sometimes as scant as 16 pages of records total.  Counsel for Plaintiffs requested, on multiple

11  occasions, an affidavit detailing the methods used to deem records duplicative or nonresponsive

12  so that Plaintiffs could confirm their representations. To date, Plaintiffs have not received such an

13  affidavit.

14      23.    The declarations Defendants submitted in support of their motion for summary

15  judgment simply recite the typical process that the agencies employ to respond to FOIA requests

16  and provide scant information about steps actually taken in response to Plaintiffs' FOIA requests

17  in this case. These declarations provide no admissible evidence about how they determined records

18  were duplicative or non-responsive.

19      24.    Despite Defendants' projections that all responsive, non-duplicative documents

20  would be produced to Plaintiffs by February 2020, Plaintiffs have continued to receive documents

21  from Defendants as recently as August 27, 2020—over two years after Roxsana's death and nearly

22  nineteen months after Plaintiffs made their FOIA requests.

23      25.    By January 2020, it became clear from ICE's productions, which did not include a

24  mortality review or root cause analysis ("RCA"), that the agency had not tasked the FOIA request

25  to ensure it was adequate under the Act. On January 14, 2020, I sent a follow-up FOIA request

26  entitled "Re: Request for records pertaining to FOIA Case No. 2019-ICLI-00053" for:

27         1.    any and all **requests for records** in the possession of
               Immigration Customs Enforcement ("ICE") that pertain to
28                 our offices' prior FOIA request made on January 29, 2019

6

assigned the FOIA Case No. 2019-ICLI-00053 including any and all requests pursuant to 5 U.S.C. § 552 *et seq*., or any other legal authority authorizing the release of records to the public;

2.   any and all communications, documents, memoranda or reports including emails and text messages within the possession of ICE pertaining to **ICE's tasking of searches and responses** of the above referenced request;

3.   any and all **video surveillance footage** in the possession of ICE of Jeffrey Hernandez Rodriguez aka Roy Alexander Hernandez Rodriguez aka Roxsana Hernandez (hereinafter "Ms. Hernandez") DOB: February 18, 1985, A#206418141, from May 9, 2018 through May 25, 2018." *See* **Exhibit F**.

26.   I also requested expedited processing:

"Pursuant to 5 U.S.C.A. § 552(E)(i) (West) and 6 C.F.R. § 5.5(e) I request **expedited processing** of this request because the documents requested and your office's expedited response implicates significant due process rights for our office, the estate of Ms. Hernandez, and for our clients, the surviving siblings of Ms. Hernandez. Our office made our underlying request for records on January 29, 2019 for any and all records pertaining to Ms. Hernandez, including a signed release by the personal representative of Ms. Hernandez' estate. Our office never received an acknowledgement of this request from your office. On May 31, 2019, our office, along with the personal representative of Ms. Hernandez' estate, filed suit to compel the agency to comply with our request in the United States District Court for the Northern District of California. We never received any records pursuant to this request until over eight months after we made it through this lawsuit. Our office continues to receive various pages of documents monthly from ICE, however, counsel for your office has failed to provide us with affidavits substantiating that withheld documents are duplicative and counsel, which has given us reason to believe that ICE's search for records and tasking of the search are inadequate. Our office also represents the surviving siblings of the deceased subject of the requested records to bring a wrongful death case under the Federal Tort Claims Act (FTCA) against the United States for the death of Ms. Hernandez. As such, we, and the personal administrator of Ms. Hernandez' estate, who is charged with prosecuting her wrongful death claim, rely upon the documents produced by ICE through our request in order to develop the wrongful death case. The statute of limitations to file the federal tort claim is two years from the anniversary of Ms. Hernandez' death, which is quickly approaching, specifically May 25, 2020. Until ICE complies with FOIA and produces all requested documents, our office is unable to fully develop our case. Because of ICE's continued delay producing documents in violation of FOIA, our office has been severely disadvantaged to prepare this case and the personal administrator of Ms. Hernandez' estate is unable to fulfill her duty to prosecute Ms. Hernandez' wrongful death claim. The instant FOIA request is intended to understand better the adequacy of ICE's search and tasking of our initial request in order to compel the agency to fully comply with our request in <u>TLC v. ICE,</u> Case No. 3:19-cv-03032 SK, so that we may timely prepare our FTCA claim. As such, ICE's response to this request bears directly on our due process rights as a plaintiff in <u>TLC v. ICE</u>, and upon the due process rights of Ms. Hernandez' estate, and her siblings who we

7

Civil Action No.: 3:19-cv-03032-SK                    Declaration of Dale Melchert in Suport of Plaintiffs' Cross-Motion for
                                                      Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment

represent, in their wrongful death case. I certify that the above is true and correct." A true and correct copy of my FOIA request dated January 14, 2020 is attached as **Exhibit G** (internal footnotes omitted for clarity).

27.     On February 10, 2020, ICE sent an acknowledgment letter assigning my request with tracking number 2020-ICFO-21832 and denying our request for expedited processing. A true and correct copy of the FOIA Acknowledgment 2020-ICFO-21832 is attached as **Exhibit H.**

28.     To date, I have not received any substantive documents responsive to this request.

29.     It was only on July 27, 2020, three weeks before the parties' mediation, that Defendants produced a Vaughn index to justify their redactions, and even that belated document was watermarked as merely a "draft." A true and correct copy of Mr. Bernardoni's Email with Vaughn Indexes dated July 27, 2020 is attached as **Exhibit I**.

30.     After the parties were unable to reach a mutually agreeable settlement through mediation, Mr. Free renewed Plaintiffs' request for expedited processing of our original request. Counsel for Plaintiffs cited 26 news articles about unanswered questions surrounding Roxsana's death and six inquiries by members of Congress calling for investigation and accountability. A true and correct copy of Mr. Free's emailed request for expedited processing and its denial are attached as **Exhibit J**.

31.     Defendants have either delayed or completely failed to respond as required by FOIA at every step of this case, beginning with their failure to respond to my initial requests for over three months by ICE and eight months by CRCL.

32.     These delays and lack of response have harmed and continue to harm Plaintiffs.

33.     Plaintiff TLC represents Roxsana's family in litigation to hold ICE, CBP, DHS, and their contractors accountable for medical neglect of Roxsana.

34.     If ICE does not immediately comply with the FOIA and promptly conduct an adequate search, TLC will be harmed because we must file our FTCA complaint for the wrongful death and negligence by ICE and CBP against the U.S. between November 9, 2020 and May 9, 2021 in order for our claims to be timely. Failure to strictly comply with both of these deadlines constitutes a jurisdictional defect resulting in dismissal.

35.     TLC also faces harm to its case against the private contractors responsible for Roxsana's transportation and care. *Youngers v. Management Training Company et al*, 1:20-cv-00465 (D.N.M. 2020). In order for all our claims to be timely, TLC filed this complaint on May 13, 2020. Defendants must respond by October 21, 2020. We anticipate we will be facing motions to dismiss. The documents received from Defendants in the instant case were instrumental to the facts asserted in our complaint against the contractors.

36.     Despite making our FOIA request in January 2019, ICE still has not produced an RCA—a critical document to determining the various contributing factors to death—a year and a half later. An RCA is customarily completed after all custodial deaths. It involves five steps, including assembly of team;[1] however, the RCA lead may determine after initial investigation that all five steps are not warranted.[2]

37.     After multiple inquiries by Mr. Free, Defendants produced a supplemental production, including an excel spreadsheet and handwritten notes for the RCA investigation on May 8, 2020, but no RCA report. A true and correct copy of the RCA Materials provided are attached as **Exhibit K**. These materials include interview notes and a timeline leading up to Roxsana's death. *See* **Exhibit K.** However, none of the materials produced by Defendants included communications that indicate the agency's decision that an RCA was not warranted. Surely, if the process had been started, as the supplemental materials indicate, and no RCA report exists, as Defendant ICE maintains, then someone made a decision to abandon it. Either an RCA exists and defendants failed to produce it, or someone decided an RCA was not warranted and communicated that decision to the RCA team. In either case, the absence of information indicates that ICE failed to conduct an adequate search, as Plaintiffs have received neither.

38.     Similarly, the agency has not produced all drafts of its mortality review—Immigrant Health Services Corps' assessment of the appropriateness of the clinical care provided and the effectiveness of the facility's policies and procedures relevant to the circumstances

---

[1]   IHSC *Root Cause Analysis Guide* (Mar. 25, 2016) at 7, available at https://www.documentcloud.org/documents/6025505-IHSC-Root-Cause-Analysis-Guide.html

[2] *Id*. at 4-5.

1   surrounding the death. Both the RCA and the mortality review are critical documents for litigating

2   wrongful death suits such as Roxsana's.

3        39.    Without them, TLC is disadvantaged as counsel for Roxsana's family because we

4   do not have all information about Roxsana in the agency's possession, and we must file our FTCA

5   claim between November 9, 2020 and May 9, 2021; otherwise our claims will be time-barred.

6        40.    Given how long it has taken for the agency to produce records, I reasonably expect

7   that an adequate search would take several months to produce all relevant documents—quickly

8   approaching the outer limit of our time limitations for the FTCA claim.

9        41.    As part of the investigation for TLC's legal representation of Roxsana's family,

10  Plaintiffs also requested records from CoreCivic, a contractor of ICE that had custody of Roxsana

11  when she died, through New Mexico's Inspection of Public Records Act ("IPRA"). Comparison

12  between the documents produced by CoreCivic with those produced by Defendants reveal that

13  Defendants' search was, in fact, inadequate and that they applied improper redactions to the

14  documents they did produce.

15       42.    A comparison of the entirety of Defendant ICE's production to date with the IPRA

16  production evidences a glaring number of documents produced by CoreCivic that were not

17  produced by ICE in the instant litigation, such as email correspondence between CoreCivic and

18  ICE employees. A total number of 162 records were produced by CoreCivic that were not produced

19  by ICE and, there were 19 pages missing of incomplete records that CoreCivic produced that ICE

20  produced partially. A true and correct copy of the Log of CoreCivic documents not produced by

21  ICE is attached as **Exhibit L**. For example, CoreCivic produced several email communications to

22  ICE employees with daily rosters during the dates Roxsana was in their custody that defendant

23  Defendants did not produce. There was a total of 22 number of such emails not produced by ICE.

24  *See* **Exhibit L**. An example of one such is email is attached as **Exhibit M**. This example is

25  representative of the other emails not produced by ICE. CoreCivic also produced emails with daily

26  updates about Roxsana's condition while hospitalized during her last days that were sent to ICE

27  employees, but ICE failed to produce any of those emails. There was a total of 11 number of such

28

emails not produced by Defendants. *See* **Exhibit I**. An example of one such is email is attached as **Exhibit N**. This example is representative of the other emails not produced by ICE.

43.    Similarly, comparison between the documents produced by CoreCivic and Defendant, CRCL reveal that CRCL failed to produce several emails pertaining to CRCL's site visit to Cibola County Correctional Center. *See* for example, one such email annexed hereto as **Exhibit O**.

44.    To create **Exhibit L,** I compiled a list of all documents that were contained within the IPRA documents that were not produced by ICE. I did this by cataloging all documents produced by defendants and all documents produced by CoreCivic then searching all productions by ICE in one combined searchable PDF for the documents produced by CoreCivic. Each record produced by CoreCivic and not produced by defendants I compiled in table form in **Exhibit L**.

45.    Defendants should have been in possession of most, if not all, of the documents Plaintiffs' received from CoreCivic, as CoreCivic is a contractor of ICE paid to carry out the responsibilities of the agency.  The discrepancies between Defendants' production in the instant matter and CoreCivic's productions demonstrate that Defendants certainly did not adequately search for responsive records or carry out an iterative review of documents initially located.

46.    Furthermore, this comparison reveals improper redactions. In several instances where the agencies redacted the email addresses of senders and recipients, ICE withheld the domain names following several email addresses (*e.g.*, @ice.dhs.gov), making it impossible to determine whether recipients of responsive documents were agency employees to test ICE's assertion that they are protected by attorney-client privilege or deliberative process privilege where it asserts (b)(5) exemptions. (Compare, for example, an email chain, attached as **Exhibit Q,** produced by ICE where several email domains have been redacted with ICE's Vaughn Index. *See* ECF #38 Attachment 1 at 85-86 asserting exemption (b)(5) for attorney-client privilege.) A true and correct copy of this email chain is attached as **Exhibit Q.** I compiled a list of all individual and enterprise level ICE and DHS email accounts that were included in CoreCivic's records but not ICE's. A true and correct copy of this list of email accounts from the CoreCivic documents is attached as **Exhibit P**. This redaction of domain names also renders it impossible to verify whether

1    third parties were included on communications for which the agencies have asserted exemption

2    (b)(5) for attorney client privilege to determine whether such withholdings are lawful. Similarly,

3    this improper redaction of domain names renders it impossible to test whether communications

4    are truly "inter-agency" pursuant to the deliberative process privilege under (b)(5) as well.

5         47.    For a complete list of all improper redactions of email domains see Plaintiffs'

6    annotation of Defendants' Vaughn Indexes attached as **Exhibit ZZ.**

7         48.    In multiple instances, ICE withheld entire pages of documents, including, notably,

8    drafts of its mortality review and detainee death reviews. Defendants produced reasonably

9    segregable portions of the ***final*** drafts of the mortality review and the detainee death review by

10   Correct Care Solutions, redacting minimal information such as identifying information of agency

11   employees, demonstrating that it is indeed possible to release non-exempt factual data from these

12   reports. (Compare the fully redacted drafts of the preliminary mortality review a true copy of which

13   is attached as **Exhibit R** with the partially redacted final mortality review a true copy of which is

14   attached as **Exhibit S**; compare also the fully redacted detainee death review drafts, a true copy of

15   which is attached as **Exhibit T** with the partially redacted final detainee death review attached as

16   **Exhibit U**).

17        49.    In its Vaughn index, Defendant ICE asserts that these fully redacted drafts are

18   entirely exempt from disclosure under the deliberative process privilege. *See* ECF No. 38

19   Attachment 1, Exhibit A at ¶20. However, neither document provides a source of agency policy,

20   and Defendants have not asserted that either is used for that purpose. In fact, detainee death reviews

21   are, by nature and purpose, public documents because the Department of Homeland Security

22   Appropriations Bill (2018) requires ICE to make public all reports regarding an in-custody death

23   within 90 days. ICE, shirking this requirement, posted a sham detainee death *report* (rather than

24   review) for Roxsana on its website on December 11, 2018, after public pressure resulting from

25   TLC's press release about its absence and the release of the independent autopsy for Roxsana on

26   November 26, 2018. However, after receiving documents from ICE in the instant case, Plaintiffs

27   learned that the operative detainee death review, complete with details, was never made public.

28   *See* partially redacted final detainee death review **Exhibit U**. ICE cannot claim that this report,

1    which is legally required to be posted on its website by Congress for the purpose of oversight, is
2    exempt from pubic inspection. ICE has made no representation that either the detainee death
3    review nor the mortality review are used to create agency policy and, therefore, cannot sustain
4    their burden to establish that their redactions of these entire drafts were proper.

5       50. Indeed, even ICE's Vaughn index supports this deduction. Pertaining to a four-page
6    document preliminary draft of the mortality review it entirely redacted, it reads: "This Preliminary
7    report was drafted by the OPR investigator who conducted investigation into the death of a
8    detainee. This report contains information pertaining to medical care, interviews of detention
9    facility personnel." *See See* ECF No. 38, Attachment #1, at ¶20. Nowhere does this explanation
10   suggest the creation or revision of agency policy.  However, the care that Roxsana received and
11   ICE's investigation into her death, as described in their Vaughn index, are matters of public
12   concern, as demonstrated by the public outcry about her death and demands for accountability
13   from the agency by lawmakers.

14      51. Similarly, Defendant CRCL, provided a cursory boilerplate explanation in its
15   Vaughn Index for withholding five paragraphs of one email that constitute all substantive
16   responses to the questions contained therein stating: "DHS applied FOIA Exemption (b)(5) to
17   protect deliberative information contained in email outlining CRCL's investigation." *See* ECF No.
18   38 Attachment 2 Exhibit E, at ¶30; and a true and correct copy of an email produce dby CRCL
19   with (b)(5) redactions attached as **Exhibit V**. This explanation fails to provide any information
20   about what renders it "deliberative" other than the fact that it is a part of its investigation.
21   Furthermore, upon information and belief, Defendant CRCL is not using the redacted information
22   to create agency policy and therefore cannot shield this information pursuant to exemption (b)(5).

23      52. Other redactions by Defendants under this exemption are plainly nonsensical. For
24   example, ICE claimed (b)(6) and (b)(7)(c) redactions in an email from a concerned staff person at
25   the Human Rights Campaign, presumably of the word "woman" or "individual" under this
26   exemption. It reads: "Please find attached a letter from [(b)(6)/(b)(7)(c)] of the Human Rights
27   Campaign (HRC), writing to express HRC's deep concern regarding the recent death of Roxsana
28   Hernandez, a transgender [(b)(6)/(b)(7)(c)] who died while in ICE custody." A true and correct

1    copy of the HRC email as produced by ICE dated May 30, 2018 is attached as **Exhibit W**.  It is

2    inconceivable that the second word redacted is someone's name or other identifying information

3    unless the author made a grave grammatical error.

4         53.    Defendants also withheld the names of high-ranking officials who are publicly

5    known and cannot be withheld pursuant to (b)(6) and (b)(7)(c). For example, Mr. Free

6    corresponded with both Andrew R. Lorenzen-Strait, ICE Deputy Assistant Director and Diane

7    Witte, who was El Paso's Field Office Director at the time, to arrange disposition of Roxsana's

8    property shortly after her death. A true and correct copy of this email correspondence between

9    Mr. Free and DHS officials dated June 13, 2018 is attached as **Exhibit X**. Both Mr. Lorenzen Strait

10   and Ms. Witte are high ranking officials yet after I searched of all records produced by Defendants

11   through both a searchable PDF in Adobe Acrobat and through a document management system,

12   Ringtail, no records containing their names resulted. Either, the agency failed to conduct an

13   adequate search or they improperly redacted the names of publicly known employees of DHS who

14   have no privacy interest (b)(6) and (b)(7)(c), or both.

15        54.    Defendants also inappropriately withheld database information based on purported

16   "national security concerns" pursuant to Exemption 7(e) of the FOIA.  For example, in Roxsana's

17   Form I-213 Record of Deportable/Inadmissible Alien, completed when Roxsana entered the US,

18   ICE withheld the contents of one box entitled "threat posted to the United States" claiming a

19   (b)(7)(e) redaction and included the following remarks: "likely to add to illegal population." *See*

20   Roxsana I-213 Form annexed hereto as **Exhibit X**. The anti-immigrant characterization of

21   Roxsana, a transgender asylum seeker fleeing rape and attempted murder expressed in the remark

22   immediately following this redaction, suggests impermissible animus by agency employees and

23   false national security concerns.

24        55.    In another instance, ICE's Vaughn index alleges a law enforcement URL was

25   redacted pursuant to (b)(7)(e). *See* Attachment 1 at 29. Upon inspection, the redaction is an entire

26   paragraph of an email sent from the Office of Professional Responsibility to the field office days

27   after Roxsana's death regarding its investigation. A true and correct copy of this email is attached

28   as **Exhibit Y**. While it is possible that a URL is an entire paragraph, it is unlikely. Moreover,

14

Plaintiffs asked Defendants at the first meet and confer held on August 19, 2019 whether any investigations by any government agencies remained open and ongoing relating to the death of Roxsana.  Pursuant to those conversations and upon information and belief of Plaintiffs, there are no open investigations relating to this matter.  Absent an open investigation relating to this matter, Defendants are not permitted to invoke Exemption 7(E) to shield documents.

56.    Defendants' Vaughn indexes lack specificity and contain boilerplate language. Plaintiffs have reviewed and highlighted all challenged redactions in the attached **Exhibit ZZ** for the reasons stated herein. A true and correct copy of Plaintiff's annotation of Defendants' Vaughn Indexes annexed hereto as **Exhibit ZZ**. Defendants continued delays complying with our FOIA requests has and continues to cause detriment to Plaintiffs.

### **VERIFICATION**

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing declaration is true and correct to the best of my knowledge and belief.

Date: September 21, 2020                                    Respectfully submitted,

/s/ Dale Melchert