**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRANSGENDER LAW CENTER; JOLENE K. YOUNGERS, as personal administrator for the wrongful death estate of Roxsana Hernandez, *Plaintiffs-Appellants*, <br><br> v. <br><br> IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF HOMELAND SECURITY; OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES - UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *Defendants-Appellees*. | No. 20-17416 <br><br> D.C. No. 3:19-cv-03032-SK <br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Sallie Kim, Magistrate Judge, Presiding

Argued and Submitted November 16, 2021
San Francisco, California

Filed May 12, 2022

Before:  Sidney R. Thomas and M. Margaret McKeown, Circuit Judges, and Jane A. Restani,* Judge.

Opinion by Judge McKeown

---

## SUMMARY**

---

### Freedom of Information Act

The panel reversed the district court's partial summary judgment in favor of federal agencies in a Freedom of Information Act ("FOIA") action involving requests for government documents related to an asylum-seeker's death in federal custody; vacated the district court's mootness determination; and remanded.

The Transgender Law Center and Jolene K. Youngers (collectively "TLC"), acting on behalf of Roxsana Hernandez's family and estate, submitted two FOIA requests.  The first FOIA request was directed to the U.S. Immigration & Customs Enforcement ("ICE"), and the second was directed to the Department of Homeland Security Office for Civil Rights and Civil Liberties.  TLC filed suit in district court seeking declaratory and injunctive relief.    The district court granted TLC's request for declaratory judgment that the agencies had failed to timely respond to their FOIA requests, but in all other respects ruled

---

* The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

for the agencies, holding that they had adequately complied with the FOIA requests, had conducted an adequate search, had appropriately applied FOIA exemptions, and had provided adequate *Vaughn* indices.

The panel first considered whether the district court erred in holding that the agencies' search was "adequate." Joining the other circuits that had considered the issue, the panel held that the agencies had the burden to demonstrate adequacy "beyond material doubt." Applying that standard, the panel concluded that the Government failed to carry its burden because the agencies did not appropriately respond to positive indications of overlooked materials provided by TLC and did not hew to their duty to follow obvious leads. The panel therefore reversed the district court's summary judgment and remanded to the district court to direct the agencies to properly comply with TLC's FOIA requests.

The panel next considered the sufficiency of the agencies' *Vaughn* indices. A *Vaughn* index is a submission that identifies the withheld documents, the claimed FOIA exemptions, and a particularized explanation of why each document fell within the claimed exemption. The panel held that the agencies' *Vaughn* indices were filled the boilerplate or conclusory statements; and this high-level, summary approach resulted in an unacceptable lack of specificity and tailoring that undermined TLC's ability to contest the agencies' withholdings. The panel remanded to the district court to direct the agencies to provide specific, non-conclusory *Vaughn* indices.

The agencies withheld and redacted information under FOIA Exemptions 5, 6, 7(C), and 7(E). First, under FOIA Exemption 5, the Government need not disclose "inter-agency or intra-agency memorandums or letters that would

not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This allows agencies to withhold privileged information, including documents revealing an agency's deliberative process. The panel held that the district court erred in treating all drafts as necessarily covered by the deliberative process privilege. Simply designating a document as a "draft" did not automatically make it privileged. The panel remanded to the district court to direct the release of the draft mortality review and the draft press statements. The district court should also reconsider the other assertions of deliberative process privilege. Second, Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The panel held that the district court erred in permitting the agencies to withhold email domains under Exemption 6. The panel remanded to the district court to direct the agencies to release the requested documents with the email domains redacted. For similar reasons, the panel held that the district court erred in permitting the agencies to withhold email domains under FOIA Exemption 7(C). Third, FOIA Exemption 7(E) allows agencies to withhold certain "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(E). The agencies broadly invoked Exemption 7(E). The district court held that the withheld information was categorically exempted under the Exemption. The panel held that this finding was overbroad, and the district court should have analyzed whether the withheld documents were, in fact, law enforcement techniques and procedures, and not guidelines (which for exemption require additional information to show that disclosure "could reasonably be expected to risk circumvention of the law"). In this situation a categorical exclusion could not be sustained as the panel had no basis to

review whether "techniques and procedures" were at issue. The panel remanded for further clarification.

The panel next considered the segregability of portions of the record from the exempt portions.  The panel held that the Government failed to come forward with clear, precise, and easily reviewable explanations for why information was not segregable.  The panel remanded for the district court to make specific findings as to whether factual information was properly segregated and disclosed in all documents.

The panel held that the district court did not err by failing to make a finding on the Government's withholding of certain documents as "non-responsive" or "duplicative."

TLC argued at the trial stage that the agencies unlawfully denied two expedited processing requests it submitted in January and August of 2020. The district court determined that the expedited processing requests were moot.  Because the panel is remanding due to the inadequacy of the agencies' compliance, the panel vacated the mootness determination, which should be reconsidered by the district court.

## COUNSEL

Irene Lax (argued), Grant & Eisenhofer P.A., New York, New York; Kimberly A. Evans, Grant & Eisenhofer P.A., Wilmington, Delaware; R. Andrew Free, Law Office of R. Andrew Free, Nashville, Tennessee; for Plaintiffs-Appellants.

Laura E. Myron (argued) and Abby C. Wright, Appellate Staff; Stephanie Hinds, Acting United States Attorney; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

At the heart of this case is an effort by advocates to learn about the circumstances of an asylum-seeker's tragic death in federal custody. The Freedom of Information Act exists for just such a purpose—to ensure an informed citizenry, promote official transparency, and provide a check against government impunity. Yet here the advocates' FOIA requests met first with silence and then with stonewalling; only after the advocates filed suit did the government begin to comply with its statutory obligations. Our task is to discern whether the government's belated disclosure was "adequate" under FOIA. We conclude that it was not.

## BACKGROUND

On May 9, 2018, Roxsana Hernandez, age 33, entered the United States seeking asylum. Hernandez, a transgender woman, was fleeing her home country of Honduras after

experiencing persecution on account of her gender identity. Upon entering the United States, Hernandez, along with several other transgender asylum seekers, was detained by officials from U.S. Customs & Border Patrol ("CBP"). According to the complaint, Hernandez's health began to deteriorate rapidly, causing her to lose weight, endure diarrhea and a persistent fever, and frequently vomit and cough up bloody phlegm.  Hernandez was seen by medical staff on May 11, 2018, and she disclosed that she had untreated HIV and was experiencing significant illness, including cough and fever.  Her physicians recommended that she receive vital HIV treatment, but U.S. Immigration & Customs Enforcement ("ICE") officials refused and instead shuttled Hernandez and the other women to various holding, processing, and detention facilities in the days that followed, depriving them of food, water, sleep, and opportunities to relieve themselves.

On May 16, 2018, Hernandez arrived at Cibola Detention Center, a private facility managed by CoreCivic, an ICE contractor.  The following day, she was taken to a local hospital and then airlifted to an intensive care unit.  Yet Hernandez's health continued to deteriorate, and on May 25, 2018, she died while in the custody of ICE officials.

Hernandez's death provoked widespread public outcry, including calls for inquiries into the deficiencies in medical care provided by CBP and ICE.  In early 2019, the Transgender Law Center and Jolene K. Youngers (collectively "TLC"), acting on behalf of Hernandez's family and estate, submitted two Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests seeking government records about Hernandez's detention and death.  The first FOIA request was directed to ICE, and the second was directed to the Department of Homeland Security ("DHS")

Office for Civil Rights and Civil Liberties ("the Civil Rights Office").

Months later, having received no records from either ICE or the Civil Rights Office,[1] TLC filed suit in district court seeking: (1) declaratory relief that ICE, DHS, and the Civil Rights Office (collectively "the Government" or "the agencies") had violated FOIA; (2) injunctive relief compelling the agencies to conduct adequate searches for the relevant records and release them; and (3) costs and attorneys' fees.

The suit itself apparently prompted ICE and the Civil Rights Office to begin disclosure, but TLC was displeased by the pace and adequacy of release, in part because the agencies refused to disclose either the mortality and morbidity review or the root cause analysis. TLC then submitted a third FOIA request.

In total, TLC received 158 pages from the Civil Rights Office and 1,591 pages from ICE. The agencies ultimately released 5 pages and 1 excel spreadsheet in response to the request for documents that went into the mortality review; the agencies informed TLC that they had conducted no root cause analysis. TLC has alleged that DHS video surveillance footage of Hernandez disappeared despite receipt of letters requiring its preservation. The agencies redacted numerous documents and claimed that many others were exempted from disclosure altogether.

On August 31, 2020, the agencies filed a motion for summary judgment, arguing that their production was

---

[1] In their brief, the agencies claim that this was "[d]ue to [a] lapse in appropriations . . . and [a] backlog of FOIA requests received by ICE."

complete and "adequate." TLC filed a cross-motion for summary judgment, arguing that the agencies improperly denied expedited search requests related to the FOIA requests at issue, failed to conduct an adequate search, improperly applied each of the FOIA exemptions, and furnished insufficient *Vaughn* indices. The district court granted TLC's request for declaratory judgment that the agencies had failed to timely respond to their FOIA requests, but in all other respects ruled for the agencies, holding that they had "adequately complied with [TLC's] FOIA requests," had "conducted an adequate search," had "appropriately applied FOIA exemptions to the documents at issue," and had provided "adequate" *Vaughn* indices. TLC timely appealed.

## ANALYSIS

We review de novo a district court's grant of summary judgment. *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 988–89 (9th Cir. 2016) (en banc) (per curiam). We therefore employ the same standard used by the district court and must "view the evidence in the light most favorable to the nonmoving party, determine whether there are any genuine issues of material fact, and decide whether the district court correctly applied the relevant substantive law." *Id.* at 989.

## I.  ADEQUACY OF THE GOVERNMENT'S SEARCH

We first consider whether the district court erred in holding that the agencies' search was "adequate." To do so, we clarify the precise burden that agencies bear in demonstrating the adequacy of their search. In accord with well-established precedent, the parties agree that the trial court must assess whether the Government has met its burden of demonstrating that its search was "reasonably calculated to uncover all relevant documents." *Hamdan v.*

*Dep't of Just.*, 797 F.3d 759, 770 (9th Cir. 2015).  According to the agencies, in order to make such an assessment the court must simply determine whether the agency's search was "adequate."  By contrast, TLC asserts that, while a court must determine whether the search was "adequate," the agency has a burden to demonstrate adequacy "beyond material doubt."

The district court assessed adequacy of the search but did not address the agencies' precise burden of proof.  We join our sister circuits and hold that "beyond material doubt" is the appropriate standard.  Applying that standard, we conclude that the Government has failed to carry its burden.

## A. The Government must prove adequacy "beyond material doubt"

Circuit courts across the country have stated that agencies must demonstrate adequacy "beyond material doubt" or "beyond a material doubt."  *See, e.g.*, *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1248 (11th Cir. 2008); *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007); *Miller v. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985).  District courts in *every* circuit, including the Ninth Circuit, use this standard, and no circuit has explicitly rejected it.  *See, e.g.*, *Informed Consent Action Network v. NIH*, No. CV-20-01277-PHX-JJT, 2021 U.S. Dist. LEXIS 118185, at *9 (D. Ariz. June 24, 2021); *Our Child.'s Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1082 (N.D. Cal. 2015); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. CIV. S-06-2845 LKK/JFM, 2008 U.S. Dist. LEXIS 107177, at *35 (E.D. Cal. June 20, 2008).

Demonstrating adequacy "beyond material doubt" is, to be sure, a heavy burden, but such a burden appropriately

reflects the purpose and policy of FOIA, including transparency, public access, and an informed citizenry.  *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."); *Hamdan*, 797 F.3d at 769–70 ("Government transparency is critical to maintaining a functional democratic polity, where the people have the information needed to check public corruption, hold government leaders accountable, and elect leaders who will carry out their preferred policies.  Consequently, FOIA was enacted to facilitate public access to [g]overnment documents by establish[ing] a judicially enforceable right to secure [government] information from possibly unwilling official hands." (alterations in original) (internal quotation marks omitted)).

Requiring the Government to meet the "beyond material doubt" standard ensures that the "adequacy of an agency's search for requested documents is judged by a standard of reasonableness." *Miller*, 779 F.2d at 1383 (citing *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). This approach properly places a concrete burden of proof on the Government, requiring an agency to show that it has undertaken all reasonable measures to uncover all relevant documents.  This standard also gives teeth to the adequacy standard by preventing agencies from blithely asserting adequacy without backing up such an assertion.

Aligning ourselves with the other circuits to consider the issue, we conclude that, under FOIA, agencies bear the burden of demonstrating the adequacy of their search beyond a material doubt.

### B. The agencies failed to demonstrate adequacy beyond material doubt

Applying this standard, we hold that the agencies failed to meet their burden because they did not appropriately respond to "positive indications of overlooked materials" provided by TLC, *Hamdan*, 797 F.3d at 771, and did not hew to their duty to follow "obvious leads," *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999).

"An agency can demonstrate the adequacy of its search through 'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Hamdan*, 797 F.3d at 770 (quoting *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). The affidavits need not "set forth with meticulous documentation the details of an epic search for the requested records," *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982) (per curiam), and they "are presumed to be in good faith," *Hamdan*, 797 F.3d at 770 (citing *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981) (per curiam)). Ultimately, the adequacy of a search is judged "not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).

Here, summary judgment was inappropriate because TLC provided the agencies with both "well-defined requests" and "positive indications of overlooked materials," *Hamdan*, 797 F.3d at 771, as well as "leads that emerge[d] during [the agencies'] inquiry," *Campbell v. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998). In the first FOIA letter, TLC included two pages of detailed search requests. In later communiques, TLC provided additional search leads that emerged as a result of a state-level public records request TLC had made of CoreCivic, the ICE contractor that ran the

detention facility in which Hernandez died.  TLC also provided detailed indications that the agencies' initial production was lacking many significant documents within their possession.  For example, TLC identified several relevant documents turned over by CoreCivic that were not produced by the agencies, despite—all agree—being in the agencies' possession.  And TLC's follow-up explanations were not cursory complaints—TLC identified 48 custodian email accounts (14 ICE enterprise level accounts, 32 ICE individual custodian emails, and 2 DHS individual custodian emails) that the agencies apparently refused to search.

In response, the agencies claimed that TLC has "no basis to contend that relevant documents were not produced from these accounts . . . ."  Because ICE and the Civil Rights Office "appropriately redacted all non-public facing employee names, including their email addresses, which included the names," the agencies may well have already turned over emails belonging to those accounts.  Yet were a court to accept this argument, it would effectively eviscerate the FOIA right.  The agencies' response—in effect, we *may* have already done this search but you'll never know— cannot meet the agencies' burden of demonstrating adequacy "beyond material doubt."  While an agency is not required "to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found," *Lahr v. Nat'l Safety Bd.*, 569 F.3d 964, 987 (9th Cir. 2009) (quoting *Miller*, 779 F.3d at 1385), in this case the agencies made *no* representation as to the diligence of their search, instead seeking to avoid the matter by relying on their decision to redact.  This circular approach falls short of the agencies' burden.

In light of the new leads and indications of overlooked material, the agencies have not met their burden of demonstrating adequacy beyond material doubt. We therefore reverse the district court's grant of summary judgment and remand this matter to the district court to direct the agencies to properly comply with TLC's FOIA requests. In so doing, the agencies should consider, in particular, the leads provided by TLC, including the 48 custodian email accounts, as well as TLC's query regarding any records relating to the Civil Rights Office's visit to the Cibola County Correctional Center as part of its investigation into Hernandez's death (including any emails, calendar invitations, other logistical records, or any factual findings as a result of the investigation).

## II.  SUFFICIENCY OF THE AGENCIES' *VAUGHN* INDICES

A *Vaughn* index is a submission that "identif[ies] the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption." *Lahr*, 569 F.3d at 989 (internal citation omitted). Such an index must "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992). "Specificity is the defining requirement of the *Vaughn* index." *Wiener v. FBI*, 943 F.2d 972, 979 (9th Cir. 1991); *see also Hamdan*, 797 F.3d at 773 (agency must be "as specific as possible"). For this reason, the agency "may not respond with boilerplate or conclusory statements." *Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012). The agency "bears the burden of demonstrating that the exemption properly applies

to the documents." *Yonemoto v. Dep't of Veterans Affs.*, 686 F.3d 681, 692 (9th Cir. 2012), *overruled on other grounds by Animal Legal Def. Fund*, 836 F.3d at 989.

The district court devoted roughly half a page to the question of the adequacy of the *Vaughn* indices, concluding simply, "as Defendants point out, the *Vaughn* indices submitted contain all of the elements required by law" insofar as they "are specific, explain the exemptions applied, and are entitled to a presumption of good faith." But, as TLC appropriately points out, the agencies' *Vaughn* indices are "riddled with 'boilerplate or conclusory statements.'" For instance, the Civil Rights Office provided copy-and-pasted generic descriptions in five of six total entries invoking FOIA Exemption 5, failing to explain how the specific content of each document individually implicated the agency's deliberative process. Similarly, when the agencies invoked FOIA Exemption 7, they provided almost identical copy-and-pasted generic descriptions in nearly every instance. This high-level, summary approach resulted in an unacceptable lack of specificity and tailoring, thus undermining TLC's ability to contest the agencies' withholdings.

While it is not the case that "an agency can never repeat language to justify withholding multiple records," *Hamdan*, 797 F.3d at 774, an agency must "disclose[] as much information as possible without thwarting the [claimed] exemption's purpose," *Wiener*, 943 F.2d at 979. It would be a stretch to say that the agencies' indices did so in this case. For example, one *Vaughn* index states, in part, that the Civil Rights Office redacted an email "to protect deliberative information contained in [the] email outlining [its] investigation." Such an explanation, omitting even general occupation titles for the sender and recipient, undermines

TLC's ability to understand why the exchange is exempted. Once again, the Government has not met its burden of specificity.

As we counseled in *Wiener*, the Government "must bear in mind that the purpose of the index is not merely to inform the requester of the agency's conclusion that a particular document is exempt from disclosure . . . but to afford the requester an opportunity to intelligently advocate release of the withheld documents and to afford the court an opportunity to intelligently judge the contest." *Id*. The Government's *Vaughn* indices failed to afford TLC or the district court such an opportunity and were therefore insufficient. We remand to the district court to direct the agencies to provide specific, non-conclusory *Vaughn* indices.

## III.   WITHHOLDINGS AND REDACTIONS UNDER FOIA EXEMPTIONS 5, 6, AND 7

The agencies withheld and redacted information under FOIA Exemptions 5, 6, 7(C), and 7(E). Withholding is permissible "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption" and only after "consider[ing] whether partial disclosure of information is possible" and taking "reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A). The Supreme Court has "consistently stated that FOIA exemptions are to be narrowly construed." *Dep't of Just. v. Julian*, 486 U.S. 1, 8 (1988). The burden of proving that withheld documents fit into the exemptions falls on the agencies. *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

We recognize that the agencies' broad withholdings required the district court to slog through hundreds of pages

of indices containing thousands of invocations. Indeed, the following discussion of these exemptions is tedious enough. Nonetheless, this is what FOIA requires, and the burden should fall on the agencies, not the court, to provide sufficient detail for an adequacy review. The agencies failed to properly withhold or redact certain documents under each claimed exemption.

## A.  FOIA Exemption 5

Under Exemption 5, the Government need not disclose "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). This allows agencies to withhold privileged information, including documents revealing an agency's deliberative process and confidential attorney-client communications. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). TLC barely raised any arguments regarding the invocation of attorney-client privilege, so we focus our analysis on the Government's invocation of the deliberative process privilege—namely with respect to non-final drafts (including drafts of the detainee death review and mortality review), pre-decisional internal discussions and emails, and emails regarding non-final drafts.

To properly assert this privilege, an agency must show that a document is both "(1) 'predecisional' or 'antecedent to the adoption of agency policy' and (2) 'deliberative,' meaning 'it must actually be related to the process by which policies are formulated.'" *Nat'l Wildlife Fed'n v. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988) (quoting *Jordan v. Dep't of Just.*, 591 F.2d 753, 774 (D.C. Cir. 1978)); *see also Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021). A document is "predecisional" if it was

"prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975). A document is "deliberative" if "disclosure of materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Assembly of the State of Cal. v. Dep't of Commerce*, 968 F.2d 916, 921 (9th Cir. 1992) (quoting *Dudman Comms. Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)).

The district court essentially treated all drafts as necessarily covered by the deliberative process privilege. But this was error: "simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." *Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004). Two withheld documents illustrate the hazards of allowing the Government to effectively exempt all drafts. ICE, for example, withheld a draft mortality review, simply stating in its *Vaughn* index that "[t]his Preliminary report . . . contains information pertaining to medical care [and] interviews of detention facility personnel." Yet such an explanation contains *no* references to any decision to which the document pertains. Likewise, the agencies withheld draft press statements without adequately explaining how they reveal a deliberative process. Government "deliberations regarding how best to address public relations matters or possible responses to an inquiry received from an outside entity are not the type of policy decisions the privilege is intended to protect." *Al Otro Lado, Inc. v. Wolf*, No. 3:17-cv-2366-BAS-KSC, 2020 U.S. Dist. LEXIS 204854, at *12–13 (S.D. Cal. Nov. 2, 2020) (internal quotation marks and citation omitted). In such instances, the Government failed

to meet its burden of demonstrating predecisional status and deliberation.

In line with our precedent, we remand to the district court to direct the release of the draft mortality review and the draft press statements.  The district court should also reconsider the other assertions of deliberative process privilege.

## B. FOIA Exemption 6

Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The phrase "'similar files' has a 'broad, rather than a narrow meaning.'"  *Forest Serv. Emps. for Env't Ethics v. Forest Serv.*, 524 F.3d 1021, 1024 (9th Cir. 2008).  "Our cases establish a two-step test for balancing individual privacy rights against the public's right of access" under Exemption 6, which begins with a threshold evaluation of whether the personal privacy interest at stake "is nontrivial."  *See Cameranesi v. Dep't of Def.*, 856 F.3d 626, 637 (9th Cir. 2017).  "[G]overnment records containing information that applies to particular individuals satisfy the threshold test of Exemption 6."  *Forest Serv. Emps.*, 524 F.3d at 1024.

The agencies invoked Exemption 6 in thousands of instances.  TLC objects specifically to the use of Exemption 6 to shield email domains (for example, @ice.dhs.gov).  The district court held that Exemption 6 allowed ICE and the Civil Rights Office to properly withhold email domains as "similar files," because they "relate to a particular person."  Yet email domains are not specific to particular individuals—email domains are shared by all employees within a given DHS component—so they do not satisfy the threshold test, and thus cannot be withheld per Exemption 6.  *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 n.4

(1982) ("Information unrelated to any particular person presumably would not satisfy the threshold test.").

Email domains reveal which government agencies and agency components were involved in decisions and communications regarding Hernandez and her death.  Since "domains normally indicate what government agency employs the individual email address holder," their release would help TLC understand "which agencies and departments are involved in making different types of decisions."  *Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, 59 (D.D.C. 2019).  This disclosure can be done without any identification of individuals.  Accordingly, the district court erred in permitting the agencies to withhold email domains under Exemption 6.  We remand to the district court to direct the agencies to release the requested documents with the email domains unredacted.

## C.  FOIA Exemption 7(C)

For similar reasons, the district court erred in permitting the agencies to withhold email domains under Exemption 7(C).  *See Yonemoto*, 686 F.3d at 693 n.7 (noting that it is appropriate to consider Exemptions 6 and 7(C) together).  Exemption 7(C) allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the[ir] production . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  As with Exemption 6, the agencies improperly redacted email domains by relying on Exemption 7(C).  We remand to the district court to direct the release of the email domains.

### D.  FOIA Exemption 7(E)

Exemption 7(E) allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose *techniques and procedures* for law enforcement investigations or prosecutions, or would disclose *guidelines* for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."   5 U.S.C. § 552(b)(7)(E) (emphasis added).   The requirement that the Government show that disclosure "could reasonably be expected to risk circumvention of the law" applies only to *guidelines* for law enforcement investigations or prosecutions, not to *techniques and procedures*.   *Hamdan*, 797 F.3d at 778. "'[G]uidelines' refer to how the agency prioritizes its investigative resources, while 'techniques and procedures' cover 'how law enforcement officials go about investigating a crime.'"   *Anguiano v. ICE*, 356 F. Supp. 3d 917, 923–24 (N.D. Cal. 2018).

The agencies broadly invoked Exemption 7(E), claiming it protected from disclosure numerous codes, information "concerning the number of guards used at detention facilities, location of cameras, as well as the staffing and routes used to transport detainees," and information concerning technology "used for law enforcement purposes."   The district court concluded that "the information that ICE and [the Civil Rights Office] withheld . . . would disclose law enforcement techniques and procedures if released . . . . As such, this information is categorically exempted under [Exemption 7(E)]."

Such a finding is overbroad.   The district court should have analyzed whether the withheld documents were, in fact,

techniques and procedures, and not guidelines (which for exemption require additional information to show that disclosure "could reasonably be expected to risk circumvention of the law").  For instance, ICE withheld the "factors and circumstances taken into consideration by ICE personnel when detaining and transporting detainees." Neither ICE nor the district court explained *why* these documents were "techniques and procedures" rather than "guidelines."   Absent an analysis, such "factors and considerations" could plausibly be construed as reflecting "how the agency prioritizes its investigative resources" (i.e., guidelines), rather than "how law enforcement officials go about investigating a crime" (i.e., techniques and procedures).  *Id.* at 924.  In this situation, a categorical exclusion cannot be sustained as we have no basis to review whether "techniques and procedures" were at issue.[2]

We remand this matter to the district court to direct the agencies to (1) clarify *whether* each document withheld is a "technique and procedure," rather than a guideline, and then proceed accordingly, and (2) account for the revelations from the CoreCivic production (which indicate that the

---

[2] Our conclusion is strengthened by evidence that the Government withheld information under this exemption in an overbroad manner.  For instance, ICE redacted a portion of Hernandez's credible fear interview under Exemption 7(E), but when TLC received an unredacted version from the CoreCivic production, the redacted text read as follows: "I left because my life was threatened by the Maras gang.  A group of Maras raped and tried to kill me I was afraid for my life and left Honduras." This statement from Hernandez could not possibly fall under the category of techniques, procedures, or guidelines.  Such a redaction suggests that the agencies may have invoked Exemption 7(E) in an effort to shield prejudicial information.  *See Pulliam v. EPA*, 292 F. Supp. 3d 255, 260 (D.D.C. 2018).

agencies were overbroad in their reliance on Exemption 7(E)).

## IV.    SEGREGABILITY

FOIA provides that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).  Glossing this provision, we have repeatedly held that "[i]t is reversible error for the district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof, with respect to that document."  *Hamdan*, 797 F.3d at 779 (alteration in original) (internal quotation marks omitted) (quoting *Wiener*, 943 F.2d at 988).  Indeed, a district court errs "by failing to make *specific* findings on the issue of segregability."  *Wiener*, 943 F.2d at 988 (emphasis added).   This requirement dovetails with the principle that a district court errs when it grants summary judgment where the agency "did not provide [plaintiff] or the district court with specific enough information to determine whether the [agency] had properly segregated and disclosed factual portions of those documents that the [agency] claimed were exempt under the deliberative process privilege."  *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1149 (9th Cir. 2008).

The district court held only that, with respect to records withheld as deliberative process privilege (under Exemption 5), "DPP material is generally not segregable from the facts it contains," and, therefore, TLC's arguments regarding the segregability of materials withheld as DPP "are incorrect." The district court failed to examine, with any specificity, the Government's broad redactions.

For instance, the agencies redacted the draft detainee death review in its entirety, despite the fact that the final detainee death review (which was released) included considerable factual information.   The agencies also redacted the draft mortality review in its entirety—justifying this on the grounds that the draft contained "information pertaining to medical care [and] interviews of detention facility personnel"—despite the likelihood of such a review also containing factual information.   The agencies additionally redacted broad swaths of emails.  The agencies did not make any representations as to the segregability of factual information within these documents, although it was their burden "to establish that all reasonably segregable portions of a document have been segregated and disclosed." *Id.* at 1148.  This evidentiary vacuum makes it difficult for the district court, which ultimately did not make any findings regarding the segregability of factual information potentially contained within these redacted materials.

The deliberative process privilege does not cover "[p]urely factual material that does not reflect deliberative processes . . . ."   *FTC v. Warner Comms., Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (citing *EPA v. Mink*, 410 U.S. 73, 87–89 (1973)).  Only when the "factual material . . . is so interwoven with the deliberative material that it is not severable" is an agency relieved of the burden to segregate and disclose non-privileged factual information.  *Id.* (citing *Binion v. Dep't of Just.*, 695 F.2d 1189, 1193 (9th Cir. 1983)).  The district court cited no authority to justify its assertion that "DPP material is generally not segregable from the facts it contains."  Such a conclusory statement cannot excuse the agencies' failure to provide specific information with respect to segregability, nor does it satisfy the district court's obligation to make findings on the issue of segregability.  *See Hamdan*, 797 F.3d at 779.

We recognize that our caselaw, which demands a careful document-by-document review, may place considerable strain on already overburdened district courts. That is precisely why we require the Government to come forward with clear, precise, and easily reviewable explanations for why information is not segregable. The Government's failure to do so here requires that we remand and order, as we did in *Pacific Fisheries*:

> On remand the district court must make specific findings as to whether factual information has been properly segregated and disclosed in all documents or portions of documents that the [agencies] claim[] are exempt from disclosure under the deliberative process privilege . . . . In order to assist the district court, the [agencies] should submit affidavits describing in more detail the withheld portions of these documents so that both the district court and [plaintiffs] can evaluate the government's claims of exemption. If the government is unable to provide sufficiently specific affidavits, the district court should review the documents *in camera* to determine whether the factual portions were properly segregated and disclosed.

539 F.3d at 1150 (citations omitted). The district court should consider, in particular, whether non-segregable information might be found in: material withheld under the deliberative process privilege; the draft detainee death review; and the redacted emails.

## V.  DUPLICATIVE AND NON-RESPONSIVE DESIGNATIONS

TLC alleges that the district court "erred" by failing to make a finding on the Government's withholding of certain documents as "non-responsive" or "duplicative."  Because no binding precedent or statute points to such an obligation, the district court did not err in neglecting to make such a finding.  Given the multiple failures noted here, however, the district court should take whatever steps are practicable to ensure that these designations are applied properly.

## VI. EXPEDITED PROCESSING REQUESTS

At the trial stage, TLC argued that the agencies unlawfully denied two expedited processing requests it submitted in January and August of 2020.  TLC pointed to 6 C.F.R.  § 5.5(e)(2), which provides that a request for expedited processing of a FOIA request may be made at any time.  The agencies countered that the January and August 2020 requests were not merely expedited processing requests for Plaintiffs' existing FOIA requests, but were new FOIA requests seeking additional information, among other arguments.  The district court held that it "need not decide whether the expedited requests are related to the requests at issue in this lawsuit or are new requests," because the agencies had "adequately complied" with TLC's initial FOIA requests, and therefore "the expedited processing requests themselves are now moot."

Because we are remanding due to the inadequacy of the agencies' compliance, we vacate the mootness

determination, which should be reconsidered by the district court.[3]

**REVERSED, VACATED, and REMANDED.**

---

[3] Because TLC will have "substantially prevailed" within the meaning of the FOIA statute, it will be eligible to have "reasonable attorney fees and other litigation costs" assessed against the United States. 5 U.S.C. § 552(a)(4)(E). We remand to the district court to make a determination as to fees and costs. *Schoenberg v. FBI*, 2 F.4th 1270, 1275–76 (9th Cir. 2021).